Guido COSZALTER; Gary Jones; Steve Johnson, Plaintiffs–Appellants,

v.

CITY OF SALEM, a municipal corporation; Sam Kidd, individually and in his capacity as supervisory employee for the City of Salem; Randy Pecor, individually and in his capacity as supervisory employee for the City of Salem; Mark Scheer, individually and in his capacity as supervisor for the City of Salem; Steve Coots, individually and in his capacity as an employee of the City of Salem; Rollie Baxter, individually and in his capacity as an employee of the City of Salem, Defendants–Appellees.

No. 00–36097.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 2002.

Filed Feb. 18, 2003.

David C. Force, Eugene, OR, for the plaintiffs-appellants.

Joseph D. Robertson, Salem, OR, for the defendants-appellees.

Before: FERGUSON, W. FLETCHER, Circuit Judges, and KING,* District Judge.

WILLIAM A. FLETCHER, Circuit Judge:

Plaintiffs, current and former employees of the City of Salem, Oregon, sued under 42 U.S.C. § 1983, alleging that defendants violated their First Amendment rights by retaliating against them for publicly disclosing health and safety hazards. The magistrate judge, hearing the case with the permission of the parties, granted defendants' motion for summary judgment

after finding that most of the alleged retaliatory acts were not adverse employment actions because they did not constitute "loss[es] of . . . valuable benefit[s] or privilege[s]," and that retaliation was not a substantial or motivating factor behind those few actions that were adverse employment actions.

We reverse and remand. In a First Amendment retaliation case, an adverse employment action is an act that is reasonably likely to deter employees from engaging in constitutionally protected speech. Further, when adverse employment actions are taken between three and eight months after the plaintiffs' protected speech, a reasonable jury could infer that retaliation is a substantial or motivating factor.

## I. Background

Plaintiff Guido Coszalter is a current employee, and plaintiffs Steve Johnson and Gary Jones are former employees, of the City of Salem Public Works Department. During most of the events in questions, all three plaintiffs worked as members of the "main line crew" of the Sewer Division of the Public Works Department. Plaintiffs contend that, beginning in mid-1996, defendants retaliated against them for publicly disclosing health and safety hazards encountered in the course of their employment.

The facts in this case are disputed. A summary of events, according to plaintiffs' evidence, follows in chronological order:

1. On approximately July 8, 1996, plaintiff Coszalter contacted the news media to disclose the existence of an ongoing sewage discharge on the surface of a city street in a residential neighborhood.

* The Honorable George H. King, United States District Judge for the Central District of California, sitting by designation.

2. After work on the discharge was completed on July 11, 1996, defendants punitively reassigned plaintiffs Jones and Coszalter to new duties and admonished their replacements that if Coszalter was observed in the area of their work, he was not to be allowed on any sewer repair site.

3. Subsequent to the reassignments in # 2, plaintiff Johnson complained of unsafe working conditions and violations of safety codes to the State of Oregon Occupational Safety and Health Administration ("OR–OSHA"), and Coszalter made complaints to the Risk Manager of the City of Salem.

4. Defendants thereupon initiated a disciplinary investigation of Coszalter, alleging that he was responsible for the safety violations that he had reported to management. After completion of the investigation, plaintiffs were reassigned to their previous crew organization and duties.

5. On or about August 21, 1996, plaintiffs notified the Oregon Department of Environmental Quality ("DEQ") of raw sewage discharge from a sewer main at the Battlecreek pump station. The discharge allowed the sewage to escape into the environment, including a protected wetland.

6. Coszalter was wrongly blamed for a cost overrun resulting from the additional work required to clean up the discharge in # 5.

7. In September 1996, Coszalter reported to defendants the spillage of raw sewage from a city pump trunk; the spillage was diverted into a municipal storm sewer. Coszalter was not involved in the spill or diversion.

8. Coszalter was issued a reprimand and accused of causing the events in # 7. This reprimand was revoked after negotiations.

9. In December 1996, Coszalter reported to the Risk Manager that a blocked sewer main at Laurel Avenue was causing a raw sewage discharge in the basement of a residence.

10. On June 4, 1997, plaintiffs performed sewer repair work underneath Rose Street. On June 5, 1997, defendants notified plaintiffs that there was chemical contamination present in the soil and groundwater under Rose Street.

11. Sometime after June 4, 1997, plaintiffs notified OR–OSHA of their potentially harmful exposure to contaminants resulting from the work assignment under Rose Street.

12. On or about July 11, 1997, plaintiffs contacted the Salem Statesman Journal to notify it of the Rose Street contaminants and of plaintiffs' exposure to them.

13. On December 8, 1997, OR–OSHA issued a citation to the City of Salem, charging it with three serious violations of mandatory safety regulations during the Rose Street excavations.

14. On or about December 10, 1997, Coszalter notified the Statesman Journal that OR–OSHA had cited the City of Salem for exposing the workers to unsafe conditions. Coszalter was quoted in a Statesman Journal article as stating that he did not feel the fine was large enough. The newspaper then interviewed the Public Works Director of the City of Salem about the citations.

15. After December 10, 1997, defendants subjected Coszalter and Jones to a criminal investigation and to repeated and ongoing verbal and other harassment and humiliation.

16. Employees of defendants, encouraged by management and supervisory-level personnel, circulated and presented a petition to management requesting that plaintiffs be ordered to stop complaining and disclosing violations of the law.

17. On March 3, 1998, defendants accused Johnson of physically assaulting one of the organizers of the petition campaign, subsequently suspended Johnson without pay for ten days, and commenced employment termination proceedings. Johnson denied physically assaulting anyone and filed a grievance contesting the suspension.

18. In March 1998, defendants accused Jones and Coszalter of "disrupting" a safety training class, issued Jones a reprimand, and reduced Coszalter's pay by two steps. (Coszalter's pay reduction was later reduced to a written reprimand.)

19. In April 1998, Jones discovered that the steering wheel on his backhoe had been vandalized, and reported that fact to management.

20. Defendants told Jones he would receive another reprimand because he did not report the vandalism immediately, as required by policy.

21. On May 5, 1998, defendants ordered Johnson and Coszalter to perform work moving manhole covers without mechanical aid. Johnson suffered a permanent injury to his right shoulder and has been unable to perform his prior work since that time.

22. On May 5, 1998, the City of Salem terminated Coszalter's employment based on a charge that he had misused a cellular phone. Coszalter filed a grievance against his termination.

23. On May 11, 1998, Jones resigned from his employment.

24. On May 25, 1999, an arbitrator overruled the city's decision to terminate Coszalter, finding that he did not have sufficient notice of the city's policy on cellular phone usage. The arbitrator ordered Coszalter reinstated with full back pay.

25. On June 3, 1999, an arbitrator upheld Johnson's grievance and set aside the ten-day suspension in # 17, ordering pay-ment of lost wages. At that time, Johnson was medically unable to return to work and resigned.

26. In June 1999, after being reinstated, Coszalter asked for his ten-year service award. The City of Salem gave it to him but skipped the customary public recognition.

27. On or about October 1, 1999, Coszalter notified OR–OSHA of violations by the City of state and federal safety codes and of violations of an earlier stipulated agreement with OR–OSHA.

28. On January 5, 2000, OR–OSHA cited the City of Salem for serious violations of the applicable safety regulations.

29. On January 20, 2000, the City of Salem commenced a "special appraisal," or a ninety-day special review, of Coszalter's "productivity" and "performance."

30. On February 7, 2000, the City of Salem commenced disciplinary action against Coszalter regarding a January 12, 2002, incident in which Coszalter was not involved.

31. On April 20, 2000, the city issued another "special appraisal" of Coszalter's work, commencing a second consecutive ninety-day special review of his "productivity" and "performance."

Relying on our decision in *Nunez v. City of Los Angeles,* 147 F.3d 867 (9th Cir. 1998), the magistrate judge held, as to most of defendants' acts, that plaintiffs had not shown the loss of a valuable benefit or privilege and therefore had not shown an adverse employment action. Under his interpretation of *Nunez,* the magistrate judge found the following acts not to be adverse employment actions: temporary change of duties (# 2); disciplinary investigation (# 4); unwarranted blame (# 6); reprimand containing false accusation (# 8); criminal investigation (# 15); repeated and ongoing verbal harassment and

humiliation (# 15); employee-circulated petition (# 16); temporary and (later) remedied suspension (# 17); threat of disciplinary action (# 20); unpleasant work assignment (# 21); withholding of customary public recognition (# 26); unwarranted disciplinary action (# 30); and special appraisals (# 29 and # 31).

The magistrate judge held that the reprimand against Jones (# 18), the reduction of Coszalter's pay (# 18), and the termination of Coszalter's employment (# 22) were adverse employment actions. He held, however, that Jones and Coszalter failed to demonstrate that retaliation for their protected speech was a substantial or motivating factor behind these three actions. He noted that almost eight months elapsed between Jones's speech on July 11, 1997 and the reprimand against him; that three months elapsed between Coszalter's December 10, 1997, speech and his reduction in pay; and that five months elapsed between Coszalter's speech and the termination of his employment. Given the elapsed time between the plaintiffs' protected First Amendment speech and the retaliatory actions, and the lack of direct evidence showing that this speech constituted a substantial or motivating factor, the magistrate judge held that defendants had not violated plaintiffs' First Amendment rights.

The magistrate judge granted summary judgment to defendants, and plaintiffs timely appealed. We review a grant of summary judgment de novo. *See Clicks Billiards, Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1257 (9th Cir.2001). Viewing the evidence in the light most favorable to the plaintiffs, we must determine whether there are any genuine issues of material fact and whether the magistrate judge correctly applied the relevant substantive law. *See id.*

## II. First Amendment Violation

■ In order to state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took "adverse employment action"; and (3) that his or her speech was a "substantial or motivating" factor for the adverse employment action. *See Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996); *Nunez,* 147 F.3d at 874–75; *Hyland v. Wonder,* 972 F.2d 1129, 1135–36 (9th Cir.1992); *Allen v. Scribner,* 812 F.2d 426, 430–36 (9th Cir. 1987). We analyze these three requirements in turn.

### A. Protected Speech Under the First Amendment

■ An employee's speech is protected under the First Amendment if it addresses "a matter of legitimate public concern." *Pickering v. Bd. of Educ.,* 391 U.S. 563, 571, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See also Connick v. Myers,* 461 U.S. 138, 149–50, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "[S]peech that concerns 'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983) (quoting *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)). On the other hand, speech that deals with "individual personnel disputes and grievances" and that would be of "no relevance to the public's evaluation of the performance of governmental agencies" is generally not of "public concern." *Id.* The determination of whether an employee's speech deals with an issue of public concern is to be made with reference to " 'the content,

form, and context'" of the speech. *Allen,* 812 F.2d at 430 (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684).

The magistrate judge correctly found under this standard that all of plaintiffs' assertions of protected speech, save one, regarded matters of public concern. The magistrate judge found that the following were constitutionally protected speech: Coszalter's contacting the news media to disclose the existence of an ongoing sewage discharge (# 1); Johnson's complaints of unsafe working conditions and violations of safety codes to OR–OSHA (# 3); Coszalter's complaints to the Risk Manager of the City of Salem (# 3); plaintiffs' notifying the DEQ of a raw sewage discharge from the sewer main at the Battlecreek pump station (# 5); Coszalter's reporting to defendants that raw sewage from a city pump truck had been accidentally discharged by other employees into the environment and then swept into the sewer (# 7); Coszalter's reporting to the Risk Manager that a blocked sewer main at Laurel Avenue was causing a raw sewage discharge (# 9); plaintiffs' notifying OR–OSHA of their exposure to the Rose Street contaminants (# 11); plaintiffs' notifying the Statesman Journal of the Rose Street contaminants and of plaintiffs' exposure to them (# 12); Coszalter's notifying the Statesman Journal that OR–OSHA had cited the city for exposing the workers to unsafe conditions (# 14); and Coszalter's notifying OR–OSHA of violations by defendants of an earlier stipulated agreement with OR–OSHA (# 27). The magistrate judge found that Jones's reporting to management that his backhoe had been vandalized was not a matter of public concern (# 19), reasoning that this disclosure was of no relevance to the public's evaluation of the performance of the government. We agree with all of the magistrate judge's findings with respect to the classification of plaintiffs' speech.

## B. Adverse Employment Action

The magistrate judge based his determination that most of defendants' actions did not constitute adverse employment actions on the following language taken from our opinion in *Nunez:* "Although 'the type of sanction . . . need not be particularly great in order to find that rights have been violated,' the plaintiff must nonetheless demonstrate the loss of 'a valuable governmental benefit or privilege.'" 147 F.3d at 875 (quoting *Hyland,* 972 F.2d at 1135–36) (other citations and internal quotation marks omitted). The magistrate judge incorrectly concluded that if an alleged retaliatory act cannot be characterized as the loss of a valuable governmental benefit or privilege, it can never constitute an adverse employment action in a First Amendment retaliation case. Such a restrictive definition of "adverse employment action" is inconsistent with our case law.

A government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. at 142, 103 S.Ct. 1684. Simply because it is acting as an employer, the government does not gain the unfettered ability to interfere with the constitutional rights of its employees; that is, it cannot use employment conditions to "produce a result which [it] could not command directly." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (alteration in original) (quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)). When a government employee exercises his protected right of free expression, the government cannot use the employment relationship as a means to retaliate for that expression.

The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is

to prevent, or redress, actions by a government employer that "chill the exercise of protected" First Amendment rights. *See Rutan v. Republican Party,* 497 U.S. 62, 73, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (protection of political belief and association under the First Amendment). Various kinds of employment actions may have an impermissible chilling effect. Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights. *See id.* at 75–76, 110 S.Ct. 2729.

■ To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden. In *Allen v. Scribner,* the plaintiff alleged that he had been "reassigned to another position, and otherwise harassed in retaliation for ... remarks he made to the press." 812 F.2d at 428. We found this allegation sufficient to form the basis of a First Amendment claim. In *Thomas v. Carpenter,* 881 F.2d 828, 829 (9th Cir.1989), the plaintiff alleged that he had been banned from attending certain meetings and participating as an evaluator in training exercises in retaliation for his political activity. We found this allegation sufficient. In *Ulrich v. City and County of San Francisco,* 308 F.3d at 977, the plaintiff alleged that his government employer had subjected him to an investigation, refused to rescind his resignation, and filed an adverse employment report in retaliation for his protected speech. Again, we found that his allegation was sufficient to state a § 1983 claim seeking redress for violation of First Amendment rights. In *Anderson v. Central Point School District,* 746 F.2d 505, 506 (9th Cir.1984), the plaintiff alleged that he had been temporarily suspended from his coaching duties and insulted by his employer. We allowed the plaintiff to

recover under the First Amendment for emotional distress and damage to his reputation. Our findings in these cases were not dependent on any characterization of the government action as a denial of a valuable governmental benefit or privilege. As we stated in *Carpenter,* the relevant inquiry is whether the state had taken "action designed to retaliate against and chill political expression." 881 F.2d at 829 (quoting *Gibson v. United States,* 781 F.2d 1334, 1338 (9th Cir.1986)). Or, as we had earlier stated in *Allen,* the inquiry is whether "the exercise of the first amendment rights was deterred" by the government employer's action. 812 F.2d at 434 n. 17.

■ In some cases, the would-be retaliatory action is so insignificant that it does not deter the exercise of First Amendment rights, and thus does not constitute an adverse employment action within the meaning of the First Amendment retaliation cases. In *Nunez,* the plaintiff had only shown "that he was bad-mouthed and verbally threatened." 147 F.3d at 875. We concluded that such actions, even if taken in response to protected speech, did not constitute an adverse employment action. *Nunez* does suggest that the plaintiff "must ... demonstrate the loss 'of a valuable governmental benefit or privilege.'" *Id.* (quoting *Hyland,* 972 F.2d at 1136). But, in light of our other cases, we cannot read this language as establishing an exclusive, category-based limitation on the kind of retaliatory action that is actionable under the First Amendment. Specifically, we cannot read *Nunez* as holding that the government is allowed to take severe retaliatory actions—such as instigating unwarranted criminal investigations or disciplinary actions, or engaging in campaigns of harassment and humiliation—because those actions do not result in the loss of a valuable governmental

benefit or privilege. Such a reading would place *Nunez* in conflict with our long-standing precedents governing First Amendment public employee retaliation suits. The essential holding of *Nunez* is simply that when an employer's response includes only minor acts, such as "bad-mouthing," that cannot reasonably be expected to deter protected speech, such acts do not violate an employee's First Amendment rights.

Two recent retaliation cases in analogous areas of the law are instructive. In *Ray v. Henderson*, 217 F.3d 1234 (9th Cir.2000), the plaintiff complained about what he perceived as unfair treatment of female employees by their common employer, the Postal Service. He alleged that the Postal Service retaliated against him for having spoken out against this treatment. Adopting the language of the EEOC Guidelines, we held that, in a Title VII retaliation suit for protected speech, an "adverse employment action" was an action "reasonably likely to deter employees from engaging in protected activity." *Id.* at 1243. In *Moore v. California Institute of Technology Jet Propulsion Laboratory*, 275 F.3d 838 (9th Cir.2002), the plaintiff, an employee of the Cal Tech Jet Propulsion Lab, told the National Aeronautics and Space Administration ("NASA") that he suspected fraud involving a project the lab was performing for NASA. After the plaintiff spoke to NASA, the lab made several proposals to change his work conditions adversely, but never carried them out. The plaintiff brought retaliation claims under the federal False Claims Act and the Major Fraud Act. Both Acts contain anti-retaliation provisions comparable to those in Title VII. Following *Ray*, we held that actionable retaliation against an employee for protected speech under these Acts was any action " 'reasonably likely to deter employees from engaging in protected activity.' " *Id.* at 847 (quoting *Ray,* 217 F.3d at 1243).

*Ray* and *Moore* are analytically comparable to this case in that they involve retaliation for protected speech. In *Ray* and *Moore* the speech was protected under Title VII and under the False Claims and Major Fraud Acts, whereas in this case the speech is protected under the First Amendment. But the common concern in all three cases is protected speech, and the "reasonably likely to deter" test in *Ray* and *Moore* is the functional equivalent of the deterrence test provided in *Allen* and other Ninth Circuit precedent. *See* 812 F.2d at 434 n. 17 (test is whether "the exercise of first amendment rights was . . . deterred"). We adopt the "reasonably likely to deter" test here as the proper test for First Amendment employer retaliation cases, not as a new test, but merely as a more specific articulation of the standard set forth in previous First Amendment retaliation cases. We hold that if the plaintiffs in this case can establish that the actions taken by the defendants were "reasonably likely to deter [them] from engaging in protected activity [under the First Amendment]," they will have established a valid claim under § 1983.

Under the "reasonably likely to deter" test, some, perhaps all, of the following acts, considered individually, were adverse employment actions for purposes of plaintiffs' First Amendment retaliation suit: the transfer to new duties (# 2); an unwarranted disciplinary investigation (# 4); an unwarranted assignment of blame (# 6); a reprimand containing a false accusation (# 8); a criminal investigation (# 15); repeated and ongoing verbal harassment and humiliation (# 15); the circulation of a petition at the encouragement of management (# 16); a ten-day suspension from work (# 17); a threat of disciplinary action (# 20); an unpleasant work assignment (# 21); a withholding of customary public recognition (# 26); an unwarranted disciplinary action (# 30);

and two consecutive ninety-day "special" reviews of work quality (# 29 and # 31). When taken together, it is clear that these acts amounted to a severe and sustained campaign of employer retaliation that was "reasonably likely to deter" plaintiffs from engaging in speech protected under the First Amendment. We therefore hold that the magistrate judge erred in finding that these acts were not adverse employment actions in the context of a First Amendment retaliation case, and in granting summary judgment to the defendants based on that finding.

### C. Substantial or Motivating Factor

The magistrate judge found that three acts of the defendants were adverse employment actions, but he nonetheless granted summary judgment to defendants on the ground that plaintiffs had not shown that their protected speech was a "substantial or motivating factor" for these acts. The magistrate judge did not have occasion to consider whether retaliation was a substantial or motivating factor for the other purportedly retaliatory acts of the defendants, discussed in the previous section, because he had granted summary judgment as to these acts on the ground that they were not adverse employment actions.

■ In *Keyser v. Sacramento City Unified School District,* 265 F.3d 741 (9th Cir.2001) (as amended), we listed three ways in which a plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions. First, a plaintiff can introduce evidence regarding the " 'proximity in time between the protected action and the allegedly retaliatory employment decision,' " from which a " 'jury logically could infer[that the plaintiff] was terminated in retaliation for his speech.' " *Id.* at 751 (quoting *Schwartzman v. Valenzuela,* 846 F.2d 1209, 1212 (9th Cir.1988) (altera-

tion in original)). Second, a plaintiff can introduce evidence that "his employer expressed opposition to his speech, either to him or to others." *Id.* Third, the plaintiff can introduce evidence that "his employer's proffered explanations for the adverse employment action were false and pretextual." *Id.* at 752. Plaintiffs have provided evidence both that the three acts that the magistrate judge considered adverse employment actions came after they engaged in protected speech, and that at least one of defendants' explanations for these actions was pretextual. Defendants do not dispute that they had knowledge of plaintiffs' speech.

■ The magistrate judge held that although the reprimand of Jones (# 18), the reduction of Coszalter's pay (# 18), and the termination of Coszalter's employment (# 22) were adverse employment actions, these actions were taken too long after Jones's and Coszalter's protected speech to support an inference of retaliation. The elapsed times between the protected speech and the adverse actions were eight months, three months, and five months, respectively. We hold that the magistrate judge erred in holding that time periods of between three and eight months were too long, without regard to other circumstances, to support an inference of retaliation.

■ Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation. As we recently held in another § 1983 Fist Amendment employer retaliation case, "[A]n eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory." *Allen v. Iranon,* 283 F.3d 1070, 1078 (9th Cir. 2002). But we caution that a specified time period cannot be a mechanically applied criterion. A rule that any period

over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2002) (cautioning against considering elapsed time in isolation from other factors: "Action taken (as here) 20 months later suggests, by itself, no causality at all.")

Retaliation often follows quickly upon the act that offended the retaliator, but this is not always so. For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible. Or they may wait until they think the lapse of time disguises their true motivation. We should be particularly sensitive to this last point, for if we establish a per se rule that a specified time period is too long to support an inference of retaliation, well-advised retaliators will simply wait until that period has passed. Then—provided that the retaliator has not revealed to others his intention, and has not provided demonstrably false or pretextual reasons for his act—he may retaliate with impunity. We therefore reject any bright-line rule about the timing of retaliation. There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation. Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances. In some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive; but the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment.

■ Beyond the bare facts of the timing, plaintiffs in this case provided additional evidence that the defendants' proffered explanation for one of the three adverse employment actions was pretextual. Defendants maintained that Coszalter's employment was terminated for violating the city's policy prohibiting the personal use of a city-issued cellular phone. After taking evidence, an arbitrator overruled the city's decision to terminate Coszalter, finding a "lack of clarity and even handedness in [the policy's] implementation," stating that "[e]vidence submitted to the arbitrator made clear that the Employer's work rule on using telecommunication equipment was ambiguous," and quoting a city official's testimony that the "policy tended to change from one to the other." A reasonable fact finder could find from the inconsistent application of the cellular phone policy that the defendants' motivation for enforcing the policy (if there even was such a policy) against Coszalter was retaliation for his constitutionally protected speech. A reasonable fact finder could also find that a pretextual explanation such as this one casts doubt on other explanations that, standing alone, might appear to be true.

Now that we have held that the other acts of the defendants are adverse employment actions, the motivation for those acts may also be considered in determining the motivation for the three acts in question here. The magistrate judge, however, did not reach the question whether retaliation was a substantial or motivating factor behind the acts of the defendants as to which he granted summary judgment on the ground that they were not adverse employment actions. We, too, do not reach that question, leaving it to the magistrate

judge to address in the first instance on remand.

### III. Qualified Immunity

Defendants urge us, in the event we disagree with the magistrate judge on the questions of adverse employment action and retaliatory motive, to affirm his decision on the alternative ground of qualified immunity. The magistrate judge did not reach this question. While we have the power to affirm on any ground supported in the record, *Gemtel Corp. v. Cmty. Redevelopment Agency,* 23 F.3d 1542, 1546 (9th Cir.1994), we decline to do so here.

Governmental officials are entitled to qualified immunity only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Supreme Court decided *Pickering v. Board of Education,* establishing that the First Amendment protects employee speech on matters of "legitimate public concern," in 1968. 391 U.S. at 571, 88 S.Ct. 1731. We decided *Allen v. Scribner,* articulating a deterrent effect test for First Amendment employment retaliation cases, in 1987. 812 F.2d 426. We decided *Anderson* in 1984 and *Carpenter* in 1989. 746 F.2d 505, 881 F.2d 828. The relevant acts of the defendants took place between 1996 and 2000. Thus, at the time defendants acted, both the constitutional protection of employee speech and a First Amendment cause of action for retaliation against protected speech were clearly established.

If plaintiffs' version of the facts turns out to be true, defendants will not be entitled to qualified immunity. We therefore decline to affirm the magistrate judge's grant of summary judgment on that ground. Of course, it may turn out at trial that plaintiffs' version of the facts is not true, but that is a matter to be determined on remand.

REVERSED and REMANDED.

FERGUSON, Circuit Judge, concurring:

I concur in Judge Fletcher's opinion. I write separately to stress that government officials cannot discriminate in any manner, no matter how trivial the First Amendment expression may seem to be.

In *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 76–77 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the Supreme Court stated, "the First Amendment ... protects state employees not only from patronage dismissals but also from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights.' " (quoting the lower court opinion at 868 F.2d 943, 954 n. 4 (7th Cir.1989)). In other words, no government official can trivialize the First Amendment.