**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANGELO DAHLIA,
              *Plaintiff-Appellant,*

                    v.

OMAR RODRIGUEZ, individually and
as a Lieutenant of the Burbank
Police Department; JOHN MURPHY,
individually and as a Lieutenant of
the Burbank Police Department;
EDGAR PENARANDA, individually
and as a Sergeant of the Burbank
Police Department; JOSE DURAN,
individually and as a Sergeant of
the Burbank Police Department;
CHRIS CANALES, individually and
as a Detective of the Burbank
Police Department,
              *Defendants-Appellees,*

                   and

CITY OF BURBANK, a municipal
corporation; TIM STEHR,
individually,
              *Defendants.*

No. 10-55978

D.C. No.
2:09-cv-08453-
MMM-JEM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Submitted May 8, 2012*
Pasadena, California

*The panel unanimously concludes this appeal is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

8799

Filed August 7, 2012

Before: Kim McLane Wardlaw, Richard A. Paez, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Wardlaw

**COUNSEL**

Michael A. McGill, Michael A. Morguess, and Russell M. Perry, Lackie, Dammeier & McGill APC, Upland, California, for plaintiff-appellant Angelo Dahlia.

Michael Simidijan and Kenneth C. Yuwiler, Silver, Hadden, Silver, Wexler, & Levine, Santa Monica, California, for defendant-appellee Omar Rodriguez.

Michael Logan Rains, Harry S. Stern and Lara Cullinane-Smith, Rains, Lucia, Stern PC, Pleasant Hill, California, for defendant-appellee Edgar Penaranda.

Patricia Kinaga and Arthur B. Walsh, Kinaga Law Firm, Los Angeles, California, and Gregory Glenn Petersen, Hunt, Ortmann, Nieves, Lubka, Darling & Mah, Inc., Irvine, California, for defendant-appellee Jose Duran.

Patricia Kinaga and Arthur B. Walsh, Kinaga Law Firm, Los Angeles, California, and Gregory Glenn Petersen, Hunt, Ortmann, Nieves, Lubka, Darling & Mah, Inc., Irvine, California, for defendant-appellee Chris Canales.

Carol Ann Humiston, Office of the City Attorney, Burbank, California, and Richard Terzian, Burke, Williams & Sorensen LLP, Los Angeles, California, for defendant-appellee City of Burbank.

Eugene Philip Ramirez and Steven Jeff Renick, Manning & Kass, Ellrod, Ramirez, Trester LLP, Los Angeles, California, for defendant-appellee John Murphy.

Carol Ann Humiston, Office of the City Attorney, Burbank, California, for defendant Tim Stehr.

## OPINION

WARDLAW, Circuit Judge:

### I.

Four days after Angelo Dahlia, a detective in the City of Burbank Police Department, disclosed the alleged use of abusive interrogation tactics by his colleagues to the Los Angeles Sheriff's Department, he was placed on administrative leave by Chief of Police Tim Stehr. That decision prompted Dahlia to file a 42 U.S.C. § 1983 suit against Stehr and lieutenants, sergeants, and a detective of the Burbank Police Department, alleging that his placement on administrative leave was unconstitutional retaliation for the exercise of his First Amendment rights. The district court dismissed the suit, concluding that our decision in *Huppert v. City of Pittsburg*, 574 F.3d 696 (9th Cir. 2009), controlled Dahlia's case "unless and until overruled" and that, therefore, Dahlia's speech was not protected by the First Amendment. The district court, correctly noting that "the nature of an official's job duties are generally a question of fact," concluded that *Huppert* held "as a matter of law that disclosure of incriminating facts is within the official duties of a police officer in the State of California." Although we have significant reservations about the validity of the *Huppert* decision, we must agree with the district court that, under *Huppert*, Dahlia's disclosure to the Los Angeles Sheriff's Department was made in the course of his official duties, and thus falls outside the protection offered by the First Amendment. We therefore affirm the judgment of the district court.

### II.

We take the facts alleged in the complaint as recited by the district court in its June 18, 2010, order granting defendants' motions to dismiss:

On December 28, 2007, an armed take-over robbery occurred at the Portos Bakery in Burbank, California. On the morning of December 29, 2007, Dahlia was called at home, informed of the robbery, and advised to report to the police department to participate in the investigation. Dahlia was the "on-call detective" and assisted Detective Pete Allen, the case agent for the Portos robbery. Sergeant Penaranda, the lead sergeant on the investigation, supervised Dahlia and Allen; Lieutenant Murphy oversaw the investigation.

During the evening of December 29, 2007, several suspects were brought to the station for questioning. At one point during the interviews, Dahlia allegedly observed Lieutenant Rodriguez standing directly in front of and over a suspect who was seated in a chair immediately outside one of the interview rooms. Dahlia asserts that he saw Rodriguez use his left hand to squeeze the suspect's throat, retrieve his handgun with the right hand, place the barrel of the gun directly under the suspect's eye, and say "How does it feel to have a gun in your face motherfucker?" Over the course of the evening, Dahlia purportedly heard noises coming from the interrogation rooms, including yelling and the sound of someone being hit. He also contends he overheard officers discussing abusive interrogation tactics.

After December 29, 2007, the Department's Special Enforcement Detail ("SED") and its Vice Detail assumed responsibility for the investigation. Although Dahlia and Detective Allen remained the investigating officers, they were allegedly excluded from participating in interviews. Dahlia asserts that he witnessed more illegal interrogation tactics as the days continued.

Dahlia met with Lieutenant Murphy to report these violations. Dahlia told Murphy that "things were getting out of hand, the interviews were getting too physical, and too many people were doing their own thing and were out of control." Lieutenant Murphy allegedly told Dahlia to "stop his sniveling." When, days later, Dahlia again pleaded with Lieutenant Murphy, Murphy purportedly said that "[h]e didn't want to hear this shit again" and that "[h]e was tired of all the B.S." Dahlia contends that the interrogations and physical beatings continued. [H]e alleges that booking photos evidence the beatings, and asserts that he observed SED team members and Vice detectives put on fingerless gloves with carbon or hard plastic knuckles while preparing to execute a search warrant. Purportedly, the officers would commented [*sic*] openly that they hoped to hit someone using the gloves. At one point, Chief of Police Stehr appeared at a briefing and, on being informed that suspects were not in custody, allegedly replied "Well then beat another one until they are all in custody."

In January 2008, Dahlia and Detective Ken Schiffner met with Lieutenant Murphy and pleaded with him to put an end to the illegal tactics. Although allegedly Detective Schiffner stated that "the beatings ha[d] to stop" and Dahlia said that "the madness ha[d] to stop," Lieutenant Murphy did not intervene in the investigation. In February 2008, Dahlia alleges he heard a loud commotion from the interview rooms. On responding, Dahlia purportedly saw Sergeant Gunn standing and looking over the shoulder of Sergeant Penaranda while the latter repeatedly punched a suspect.

In April 2008, officers in the department learned that Internal Affairs intended to investigate unlawful

physical abuse of suspects and witnesses. Various individual defendants allegedly threatened or intimidated Dahlia to keep him from revealing his knowledge of the abusive tactics used to interrogate witnesses concerning the Portos robbery. Dahlia contends that Lieutenant Rodriguez and Sergeant Penaranda began visiting him in his office to monitor what he was doing. Sergeant Duran purportedly visited Dahlia's office on a daily basis and asked, "What do you know?" and "What did you hear?" Dahlia asserts that Lieutenant Rodriguez often went out of his way to walk past Dahlia's office so that he could look in and monitor what Dahlia was doing. He contends that Lieutenant Rodriguez's intimidation escalated and that he began to threaten Dahlia not to say anything to Internal Affairs. Dahlia also asserts that Sergeant Penaranda made threatening public comments, referring to officers who blew the whistle as "spineless pussies."

On April 29, 2008, Internal Affairs interviewed Dahlia. Immediately following this interview, Lieutenant Rodriguez purportedly demanded that Dahlia tell him what Internal Affairs had asked and how he had responded. Dahlia told Lieutenant Rodriguez he had not said anything. Dahlia contends that Rodriguez walked past Dahlia's office "constantly" for the remainder of that day. In the days following the Internal Affairs interview, Sergeant Duran also allegedly continued to come to Dahlia's office to monitor him. Dahlia asserts that Sergeant Penaranda asked him about the interview, and that, although he told Sergeant Penaranda he had not said anything, Penaranda threatened Dahlia not to say anything. At one point following the first interview, Detective Canales purportedly told Dahlia to "watch [his] back" and "keep [his] head down."

On May 8, 2008, Dahlia was interviewed by Internal Affairs a second time. Prior to this interview, Lieutenant Rodriguez and Sergeant Penaranda allegedly contacted Dahlia and demanded that he not say anything. Dahlia asserts that, after the interview, he received a telephone call from Lieutenant Rodriguez, who ordered Dahlia to meet him at McCambridge Park in Burbank. Dahlia believed that an incident was occurring and responded to the park. Lieutenant Rodrigez and Sergeant Duran were purportedly waiting for him in the parking lot. Dahlia contends that Rodriguez angrily asked, "What the fuck did you tell them?" Dahlia again asserted that he had revealed nothing, but Rodriguez purportedly continued to intimidate him. Dahlia maintains that, during the thirteen days between Dahlia's second and third Internal Affairs interviews, Lieutenant Rodriguez and Sergeants Duran and Penaranda continued to harass, intimidate, and threaten him. On May 2, 2008 and May 14, 2008, Dahlia purportedly received e-mails from Sergeant Penaranda, which threatened Dahlia and demanded that he "stay loyal."

On May 21, 2008, Dahlia was interviewed by Internal Affairs a third time. Immediately after Dahlia left the interview, Lieutenant Rodriguez allegedly appeared in the hallway, staring directly at him. Dahlia contends that the harassing and threatening behavior continued following this interview. At one point, Sergeant Duran purportedly engaged Dahlia in a conversation about a shooting in which Duran had been involved a few years earlier and said, "You know, there's only two people who know what happened and one of them is dead." Toward the end of 2008, Sergeant Penaranda and Lieutenant Murphy told Dahlia that a federal investigation might take place, and allegedly said that he should keep quiet. On January 30, 2009, Lieutenant Murphy and Ser-

geant Penaranda approached Dahlia at the police shooting range. Lieutenant Murphy purportedly said, "It's on. The Feds are doing an investigation and heads are going to roll. Don't say anything." Sergeant Penaranda allegedly added, "It's gonna be bad. You can't say anything." Dahlia asserts that in early February 2009, Lieutenant Rodriguez told him "not to talk to the feds." During March 2009, tension within the department was allegedly high, and the constant "monitoring" of Dahlia continued.

On April 2, 2009, Lieutenant Rodriguez called Dahlia into his office. Rodriguez purportedly shut the blinds and closed the door, retrieved his gun from his holster, and placed it in a drawer. Dahlia asserts that Rodriguez was angry and animated, and at one point placed both hands on his desk, leaned forward, and said, "I'm not a fucking cheese eating rat." He purportedly looked at Dahlia and said, "Fuck with me and I will put a case on you, and put you in jail. I put all kinds of people in jail, especially anyone who fucks with me." Dahlia reported the meeting to the Burbank Police Officers' Association President, Michael Parinello, who reported it to the Burbank City Manager.

On May 11, 2009, Dahlia was interviewed by the Los Angeles Sheriff's Department about the Portos investigation. Dahlia asserts that, during the interview, he disclosed the allegedly unlawful conduct referenced in the complaint. On May 15, 2009, Dahlia was placed on administrative leave pending discipline [by Stehr], an action that Dahlia alleges constituted retaliation for his protected speech in disclosing the unlawful conduct.

District Court Order Granting Defendants' Motions to Dismiss, *Dahlia v. City of Burbank, et al.*, No. 2:09-cv-08453 (C.D. Cal. June 18, 2010), ECF No. 70.

## III.

Dahlia filed his § 1983 complaint on November 17, 2009, alleging seven claims: (1) retaliation against a public employee for speech disclosing police misconduct in violation of the First Amendment to the U.S. Constitution; (2) retaliation against a public employee for disclosing information to a government or law enforcement agency in violation of California Labor Code § 1102.5; (3) retaliation against a public employee for making an oral or written complaint to a governmental agency in violation of California Labor Code § 6310; (4) retaliation against a public employee for disclosing an abuse of authority or a substantial and specific danger to public health or safety in violation of California Government Code § 53298; (5) violation of the Bane Act, California Civil Code § 52.1(b), which prohibits interference in the exercise of constitutional rights; (6) intentional infliction of emotional distress; and (7) negligent infliction of emotional distress.

Police Chief Stehr moved for summary judgment on several grounds, including qualified immunity. The district court denied Stehr's summary judgment motion without prejudice on the ground that it was premature because Dahlia did not have an adequate opportunity to take discovery. Stehr timely appealed the district court's denial of his motion for summary judgment.[1]

The remaining named defendants, Lieutenants Rodriguez and Murphy, Sergeants Penaranda and Duran, and Detective Canales, moved to dismiss this case under Federal Rule of Civil Procedure 12(b)(6). Granting these motions, the district court found Dahlia's § 1983 claim barred because his speech

---

[1]In a memorandum disposition filed contemporaneously with this opinion, we reverse the district court's denial of qualified immunity for Stehr. *Dahlia v. Stehr*,___ F. App'x ___, No. 10-55283, 2012 WL ___ (9th Cir. Aug. 7, 2012).

was made pursuant to his official duties and thus was not constitutionally protected, and because placement on paid administrative leave is not an adverse employment action. The district court accordingly dismissed Dahlia's § 1983 claim with prejudice, and declined to exercise supplemental jurisdiction over Dahlia's state law claims.[2] We now consider Dahlia's appeal from that dismissal.

## IV.

We have jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment dismissing with prejudice Dahlia's claims against Lieutenants Rodriguez and Murphy, Sergeants Penaranda and Duran, and Detective Canales.

We review de novo the grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Madison v. Graham*, 316 F.3d 867, 869 (9th Cir. 2002). In so doing, we accept "all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## V.

**[1]** "It is well settled that the state may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.' " *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering v. Bd. of Educ.*, 391

---

[2]The district court dismissed Dahlia's § 1983 claim against all defendants *except* Stehr, correctly ruling that Stehr's appeal of the denial of his motion for summary judgment "divests the court of jurisdiction over the action between Dahlia and Stehr." The district court thus concluded that it "lack[ed] jurisdiction to enter an order dismissing the First Amendment claim against Chief Stehr." It follows that this opinion has no bearing on Dahlia's § 1983 retaliation claim against Stehr.

U.S. 563, 568 (1968)). We make a five-step inquiry to resolve First Amendment retaliation claims:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng*, 552 F.3d at 1070-71. The district court dismissed Dahlia's complaint, reasoning that he had not met his burden of satisfying the *Eng* factors. In particular, the district court held that Dahlia failed to establish (i) that his speech was "spoken in the capacity of a private citizen and not a public employee," *id.* at 1071, or (ii) that placement on administrative leave constitutes an adverse employment action.

### A.

**[2]** "[T]he plaintiff bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee." *Eng*, 552 F.3d at 1071 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006)) (alteration in original). "[S]tatements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (internal citations and quotation marks omitted).

**[3]** The distinction drawn in our First Amendment doctrine between private and official speech is rooted in the Supreme Court's decision in *Garcetti v. Ceballos*. In *Garcetti*, a district

attorney alleged unconstitutional retaliation for an internal memorandum he had written that recommended dismissal of a pending criminal prosecution because of purported police misconduct. 547 U.S. at 414. The Supreme Court rejected his claim, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

In determining that the plaintiff in *Garcetti* wrote the memorandum at issue pursuant to his official duties, the Supreme Court explained:

> The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy.[3] That consideration—the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case—distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline . . .
>
> Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do . . . . Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created . . . . Contrast, for example, the expressions made by the speaker in *Pickering*[4], whose letter to the newspaper

---

[3]Ceballos did not dispute that he had prepared the memorandum "pursuant to his duties as a prosecutor." *Id.*

[4]In *Pickering*, the seminal decision on public employee speech, the Supreme Court held that Pickering's speech was protected from retaliation by the First Amendment. 391 U.S. at 574-75.

had no official significance and bore similarities to letters submitted by numerous citizens every day.

Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

*Garcetti*, 547 U.S. 421-23 (internal citations omitted) (footnotes added). Under *Garcetti*, the protection of the First Amendment is thus limited where the speech is part of the core tasks that the employee is "paid to perform," but not where the speech is merely related to the speaker's public employment. *Id.* at 421 ("The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive. The First Amendment protects some expressions related to the speaker's job.").

The parties in *Garcetti* did not dispute that the memorandum at issue was prepared pursuant to the plaintiff's official duties, thus the Supreme Court did not have occasion to conduct an inquiry into the scope of the plaintiff's professional duties. *Id.* at 424. However, the Supreme Court issued guidance to lower courts, noting that the "proper inquiry is a practical one" because:

formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor suffi-

cient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424-25; *see also id.* at 424 ("We reject . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.").

Three years after the Supreme Court's decision in *Garcetti*, a divided three-judge panel of our court decided *Huppert v. City of Pittsburg*, 574 F.3d 696 (9th Cir. 2009).[5] *Huppert* involved a police officer who had participated, at the order of his superiors, in several investigations regarding police corruption. *Id.* at 699. After the investigations concluded, and despite orders that he not memorialize his findings, Huppert drafted and circulated a report to his superiors and city officials. *Id.* Huppert also notified the FBI of the police corruption and cooperated with its investigation. *Id.*

The majority opinion held that Huppert's cooperation with the FBI—which took place on his own time, was not part of his official job description, and was not at the behest of any official orders—was, nonetheless, also part of his official duties. In reaching that conclusion, the panel majority, interpreting "California's jurisprudence," held as a matter of law that California police officers are required, as part of their official duties, to disclose information regarding acts of corruption:

> Though Huppert argues that he was repeatedly informed by the FBI that his investigatory work was outside his duties as a police officer, this is not enough to overcome California's jurisprudence

---

[5]The two-judge majority included Judge Tallman and Judge Bertelsman, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation. Judge W. Fletcher dissented from the decision. *See id.* at 710.

defining such duties. It is clear that in California a police officer's official duties include investigating corruption, so as to "prevent[ ] the commission of crime, . . . [and] assist[ ] in its detection." While we do not know the contents of any speech that Huppert made, we do know that such conversations with the FBI would have been to "disclos[e] all information known to [Huppert]" regarding the alleged acts of corruption within the PPD. This obviously encompasses his duty to uphold the law specifically entrusted to California's peace officers.

*Id.* at 707 (internal citation omitted). The panel majority reached its conclusion regarding "California's jurisprudence" by relying on language from a single California Court of Appeal decision from 1939, obviously decided long before the Supreme Court's decisions in *Pickering* and *Garcetti.* In that case, the Court of Appeal opined broadly:

The duties of police officers are many and varied. Such officers are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them. *Among the duties of police officers are those of preventing the commission of crime, of assisting in its detection, and of disclosing all information known to them which may lead to the apprehension and punishment of those who have transgressed our laws. When police officers acquire knowledge of facts which will tend to incriminate any person, it is their duty to disclose such facts to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury.* It is for the performance of these duties that police officers are commissioned and paid by the community, and it is a violation of

said duties for any police officer to refuse to disclose pertinent facts within his knowledge even though such disclosure may show, or tend to show, that he himself has engaged in criminal activities.

*Christal v. Police Comm'n of City & County of S.F.*, 33 Cal. App. 2d 564, 567-68 (1939) (emphasis added) (citations omitted).

The *Christal* decision was barely apposite to the facts presented in *Huppert*, and is even less so here. In *Christal*, the Police Commission for the City and County of San Francisco dismissed several police officers, who were themselves under investigation by a grand jury on charges of corruption and felonious misconduct. The grand jury subpoenaed both the officers and their records; the officers refused to comply with the subpoenas, asserting their Fifth Amendment rights against self-incrimination. *Id.* at 566-67. As the California Court of Appeal stated, "the main question involved is whether appellants, while holding positions as peace officers, could exercise the constitutional privilege of refusing to testify before the grand jury under the circumstances and still insist upon retaining their positions as police officers." *Id.* at 567. The Court of Appeal's holding was that given the fact that the police officers were under investigation for public corruption, they could not both assert their right against self-incrimination and remain as police officers. The Court of Appeal explicitly limited its holding to this context: "We are concerned here only with the result of the exercise of such privilege, by those holding the positions of police officers, in an investigation by which it was sought to determine whether such officers had been guilty of criminal activities in connection with their duties as police officers." *Id.*

The passage lifted from the *Christal* decision by the *Huppert* majority directly follows this express limitation of the decision, and must be read in that context. The passage in no way applies to situations where a police officer, not charged

with any corrupt or felonious activity but having information about misconduct by other police officers, and directed by superiors not to speak out or to testify, disregards that instruction and instead discloses information to third parties—the classic whistleblower scenario. Thus, the holding in *Huppert* is entirely unsupported by the sole California case it purports to rely upon.

[4] Nevertheless, *Huppert* plainly holds that, as a matter of California law, disclosure of police misconduct by fellow police officers contrary to the instructions of superiors is a core professional duty of California police officers, and such speech is thus not protected by the First Amendment. We have considered whether an employee's speech was pursuant to professional duty on three other occasions after *Garcetti*, but those cases do not control the outcome here because none involved an inquiry into the duties of a police officer. *See Marable v. Nitchman,* 511 F.3d 924 (9th Cir. 2007) (ferry engineer); *Freitag v. Ayers,* 468 F.3d 528 (9th Cir. 2006) (prison guard); *Eng*, 552 F.3d 1062 (deputy district attorney). We feel compelled, like the district court, to follow *Huppert*, despite our conclusion that it was wrongly decided and unsupported by the sole authority it relies upon. If Huppert, who independently cooperated with the FBI to expose and investigate corruption and memorialized that corruption against his superiors' orders, was acting "pursuant to his professional duties," then Dahlia, who cooperated with a Los Angeles Sheriff's Department investigation of police misconduct, must also have been acting pursuant to his professional duties.

## B.

[5] We acknowledge that we are bound by *Huppert*, because a three-judge panel may not overrule a prior decision of our circuit unless it has been effectively undercut by subsequent higher authority. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003). Because *Huppert* was decided after *Pickering* and *Garcetti*, we cannot conclude that "the reasoning or the-

ory of [*Huppert*] is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Id.* at 893. It is clear, however, that we have significant reservations about the holding in *Huppert*, which appears to be incorrectly decided, conflicts with the Supreme Court's First Amendment public employee speech doctrine, and chills the speech of potential whistleblowers in a culture that is already protective of its own.

The *Huppert* holding, which determines the scope of a police officer's professional duties as a matter of California law in the First Amendment retaliation context, conflicts with the Supreme Court's instruction in *Garcetti* that we make a practical, factual inquiry into the job responsibilities of each public employee plaintiff. As the Supreme Court stated:

> We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. *The proper inquiry is a practical one.* Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, *and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.*

*Garcetti*, 547 U.S. at 424-25 (emphasis added) (citations omitted).

The *Huppert* majority did exactly what the Supreme Court prohibited in *Garcetti*. It relied on a generic laundry list of police officer duties in an out-of-context California appellate court decision to determine, as a matter of law, that Huppert's speech fell within his job duties. *Huppert*, 574 F.3d at 707 (citing *Christal,* 33 Cal. App. 2d at 567-68). The majority did not conduct a "practical" inquiry tailored to Huppert's job duties. Instead, it relied on a "broad job description," which

the Supreme Court has noted "often bear[s] little resemblance to the duties an employee actually is expected to perform." *Garcetti*, 547 U.S. at 424-25.

The conclusion, as a matter of law, that whistleblowing on fellow officers is part of a police officer's official duties not only conflicts with *Garcetti*, but also with our own post-*Garcetti* case law in the First Amendment retaliation context, which consistently holds that determining the scope of a plaintiff's professional duties requires a factual inquiry tailored to the plaintiff's individual circumstances. *See, e.g.*, *Eng*, 552 F.3d at 1071 ("[T]he question of the scope and content of a plaintiff's job responsibilities is a question of fact"); *Robinson v. York*, 566 F.3d 817, 823-24 (9th Cir. 2009) (holding that the "scope of [Plaintiff's] duties is a question of fact"); *Posey*, 546 F.3d at 1129 (holding that the "scope and content of a plaintiff's job responsibilities can and should be found by a trier of fact"); *Freitag*, 468 F.3d at 546 (holding that determining the scope of professional duties requires "factual determinations").

We are mindful of the Supreme Court's caution against "the vexing nature of the distinction between questions of fact and questions of law," *Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) (citations omitted), and acknowledge that the "ultimate constitutional significance of the facts as found is a question of law." *Eng* 552 F.3d at 1071 (citing *Posey*, 546 F.3d at 1129). However, our case law is unequivocal that "the question of the scope and content of a plaintiff's job responsibilities is a question of fact." *Eng* 552 F.3d at 1071; *see also Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1071 (9th Cir. 2012) ("The scope and content of a plaintiff's job responsibilities is a question of fact . . . ."); *Posey*, 546 F.3d at 1129. Indeed, in *Posey*, we expressly considered and rejected the view that whether the speech in question was spoken as a public employee or a private citizen is solely a question of law. 546 F.3d at 1129 ("Upon consideration, we agree with the Third, Seventh, and Eighth Circuits and hold that the

determination . . . presents a mixed question of fact and law.").[6] Regardless of how we have classified the inquiry, we have repeatedly determined the scope of a plaintiff's professional duties by conducting a factual inquiry tailored to the circumstances of each particular plaintiff. *See Eng*, 552 F.3d at 1071; *Robinson*, 566 F.3d at 823-24; *Posey*, 546 F.3d at 1129; *Freitag*, 468 F.3d at 546.

The generic description of a police officer's professional duties in *Christal* does not reflect an individualized factual assessment of either Huppert or Dahlia's responsibilities, and thus, under *Garcetti* and our own First Amendment case law, cannot control the disposition of their First Amendment retaliation claims. Were we and the district court not bound by *Huppert*, the district court would have been free to consider the scope of Dahlia's professional duties—and whether he was acting in his capacity as a private citizen—as a question of fact.

Moreover, as we noted earlier, the *Huppert* majority's reliance on the generic language from *Christal* to determine the scope of a police officer's official duties is misplaced. *Christal* is a nearly seventy-three year old state court case, written

---

[6]In *Posey* we joined the Third, Seventh, and Eighth Circuits in rejecting the Fifth, Tenth, and D.C. Circuits' views that the inquiry is a question of law. 546 F.3d at 1128. However, even several of the circuits that classify the inquiry as a "question of law" nevertheless, unlike *Huppert*, undertake a tailored, fact-specific assessment of a plaintiff's professional circumstances. *See, e.g.*, *Charles v. Grief*, 522 F.3d 508, 512-13 (5th Cir. 2008) (analyzing plaintiff's particular professional role and duties, even if ultimate question of whether speech is entitled to protection is a legal question); *Wilburn v. Robinson*, 480 F.3d 1140, 1150-51 (D.C. Cir. 2007) (conducting factual inquiry into nature of plaintiff's particular professional responsibilities). As do other circuits not discussed in *Posey*. *See, e.g.*, *Trigillo v. Snyder*, 547 F.3d 826, 829-30 (7th Cir. 2008) (interpreting *Garcetti* to conclude that "to define [plaintiff]'s official duties, we must do more than look to general statutes. Our task is a practical one that requires a close look at . . . the expectations and responsibilities that came with [plaintiff's] job.").

decades before *Pickering*, *Garcetti*, or any other applicable Supreme Court precedent. In determining the scope of an employee's official duties, we are bound by the approach taken by the Supreme Court in these more recent cases. Further, as noted, *Christal* did not address the factual context in either *Huppert* or Dahlia's case where an officer chose to speak out, as opposed to refusing to speak, to reveal alleged corruption to third parties.

Even if we were to accept the generic list of police officer duties in *Christal* as an accurate portrayal of California law, neither Huppert nor Dahlia violated any enumerated duty. Indeed, *Christal* states that police officers have a "duty to disclose . . . facts [concerning misconduct] to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury." *Christal,* 33 Cal. App. 2d at 567-68. In both *Huppert* and the case before us, the speech at issue was not a disclosure to superiors, nor was it in front of a "duly constituted court or grand jury," but rather was made to external, independent investigators (the FBI and Los Angeles Sheriff's Department, respectively).

The upshot of *Huppert* is a rule, binding only in our Circuit, that the act of whistleblowing is itself a professional duty of police officers, thus stripping such speech of the First Amendment's protection. Where we draw the line between professional duty and private speech has significant implications for potential whistleblowers. Indeed, as the Supreme Court has noted:

> [P]ublic employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. The interest at stake is as

much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.

*City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (internal citation omitted); *see also See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007) ("Statements exposing possible corruption in a police department are exactly the type of statements that demand strong First Amendment protections."). *Huppert*'s treatment of the reporting of police misconduct and corruption as a routine professional duty belies the personal and professional hazards of such acts. If reporting police abuse and misconduct during the course of an internal investigation, or even a federal or third-party investigation, is considered a professional duty, and is thus unprotected speech, *as a matter of law*, it is inevitable that police officers will be even less willing to report misconduct than they are now, particularly regarding their superiors. The reasoning in *Huppert* that professional duties can be determined as a matter of law is wrong, and the result that reports of police misconduct are not protected by the First Amendment is dangerous.

## C.

The district court dismissed Dahlia's suit on the alternative ground that placement on administrative leave is not an adverse employment action. We disagree. We conclude that under some circumstances, placement on administrative leave can constitute an adverse employment action.

"To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden." *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003). The proper inquiry is whether the action is "reasonably likely to deter employees from engaging in protected activity." *Id.* at 976; *see also id.* ("We hold that if

the plaintiffs in this case can establish that the actions taken by the defendants were 'reasonably likely to deter [them] from engaging in protected activity [under the First Amendment],' they will have established a valid claim under § 1983.") (internal quotations and citation omitted) (alterations in original).

**[6]** We have never before decided whether placement on administrative leave constitutes an adverse employment action.[7] *See Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 803 n.7 (9th Cir. 2009) (declining to reach the question of whether administrative leave with pay is an adverse employment action because it had not been properly preserved for appeal). Even if we were inclined to decide the issue, we would have insufficient facts in the record to do so given the procedural posture of the case. We are unable to assess the particular form of administrative leave imposed upon Dahlia. We have only the allegations in the complaint as to the nature of Dahlia's administrative leave—that it prevented Dahlia from taking the sergeant's exam, required him to forfeit on-call and holiday pay, and prevented him from furthering his investigative experience.

**[7]** These allegations, if proven, however, may very well constitute an adverse employment action. Dahlia's allegations appear to satisfy the *Coszalter* standard, as the loss of pay, opportunities for investigative experience, inability to take a promotional exam, and the general stigma resulting from placement on administrative leave appear "reasonably likely to deter employees from engaging in protected activity." *Coszalter*, 320 F.3d at 976. Review of the Title VII case law that gave rise to the *Coszalter* standard also suggests that even administrative leave with pay constitutes an adverse employ-

---

[7]This step of the *Eng* test has a sub-element that is not at issue in this appeal: whether plaintiff's speech was a substantial or motivating factor in the adverse employment action. That issue was not raised in the briefs, and we do not reach it. *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008).

ment action. After all, temporarily placing an employee on administrative leave with pay pending a discipline determination is clearly "a tangible change in working conditions that produces a material employment disadvantage." *Spears v. Missouri Dep't of Corr. and Human Res.,* 210 F.3d 850, 853 (8th Cir. 2000). It also results in "a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities." *Hilt-Dyson v. City of Chi.,* 282 F.3d 456, 465-66 (7th Cir. 2002). And finally, it constitutes a "materially adverse change in the terms and conditions of employment." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).

## VI.

**[8]** Although we believe that *Huppert* was wrongly decided, we are bound to follow it. *Miller*, 335 F.3d at 899. We therefore affirm the district court's grant of defendants' motions to dismiss Dahlia's complaint.

**AFFIRMED.**