Filed 7/28/14  Longmire v. City of Oakland CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DERWIN LONGMIRE,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>CITY OF OAKLAND,<br><br>　　　　Defendant and Respondent. | A137344<br><br>(Alameda County<br>Super. Ct. No. RG11583958) |

　　　　Plaintiff Derwin Longmire was a sergeant with the Oakland Police Department's (OPD) homicide section initially involved in the investigation of the murder of Chauncey Bailey, a prominent African-American journalist who was killed because he was writing an unfavorable article about Your Black Muslim Bakery (Bakery).  This lawsuit stems, in part, from Longmire's conduct as the lead homicide detective in the days following the murder.  Longmire eventually came under heavy media and departmental scrutiny for his handling of the investigation and for his personal relationship with the suspected mastermind of the murder, Yusuf Bey IV (Bey IV), the 21-year-old chief executive officer of the Bakery.

　　　　After one Bakery member was charged with the murder, and with public suspicion mounting that Bey IV was also involved, newspapers reported that Longmire had intentionally compromised the investigation to deflect suspicion away from Bey IV due to his preexisting relationship with Bey IV and his family.  When a lower-ranking police

1

officer also accused Longmire of interfering in his investigation of other Bakery crimes, an internal affairs investigation was initiated. When it appeared termination would be likely, Longmire was placed on paid administrative leave. But the allegations against Longmire relating to the Bailey investigation and his Bakery ties eventually were not sustained, no discipline was imposed, and he was ultimately returned to work.

However, while that investigation was ongoing, additional allegations of insufficient investigative work on Longmire's part were raised by a new commander of the homicide section in connection with ten other unrelated investigations conducted by Longmire. Longmire was suspended for eight days as a result.

Longmire filed suit against the City of Oakland (City) alleging violations of the California Fair Employment and Housing Act (Gov. Code, § 12920 et. seq.; FEHA), claiming he was discriminated against based on his superiors' perception he was a Black Muslim. The superior court granted the City's motion for summary judgment because the City presented evidence of nondiscriminatory reasons for its actions, and Longmire presented no substantial evidence of pretext.

Because he could not substantiate his claims with evidence (1) of the decision makers' perception of him as a Black Muslim, (2) that an adverse employment action was taken against him with respect to the Bailey investigation, or (3) that the City's nondiscriminatory explanations were pretextual, we affirm the judgment.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### *Longmire's Relationship with Your Black Muslim Bakery*

Bakery, once located on San Pablo Avenue in Oakland, for decades had been controlled by its founder, Yusuf Bey, Sr., (Bey, Sr.), serving up a combination of baked goods, its own brand of Islam, and promotion of self-empowerment for the Black community. But the Bakery also came under the scrutiny of the police, who for years had investigated it for crimes ranging from welfare fraud and auto theft to sex crimes and weapons violations. In fact, the intelligence section of the OPD considered the Bakery a dangerous criminal enterprise and had kept it under investigation and surveillance for as much as 30 years.

2

After the death of Bey, Sr., in 2003, a struggle for power at the Bakery ensued, with Bey, Sr.'s immediate successor, Waajid Bey, being murdered. The next leader of the Bakery was Antar Bey (Antar), Bey, Sr.'s 24-year-old son, who also was killed in 2005.

After Antar's death, 19-year-old Bey IV (Bey, Sr.'s son) emerged as the Bakery's leader. Following Bey IV's takeover, the Bakery's involvement in crime and violence escalated. Bey IV was suspected of personal involvement in the vandalism of two liquor stores, fraud, assault, battery, kidnapping, torture, and two additional murders prior to Bailey's murder. Of particular significance to this case, besides the Bailey murder, was Bey IV's suspected involvement in the kidnapping of two women and torture of one of them in May 2007 in an attempt to get money from them.

Despite the rumors of the Bakery's criminality, Longmire had been a long-time, frequent patron of the Bakery for its baked goods. He often talked and joked with Bakery members, especially Mustafa Bey, an older member. By 2002 and 2003, when Longmire supervised the OPD's intelligence section, he had come to realize the Bakery was a criminal enterprise, but he continued to patronize it.

In 2005, while assigned to the homicide section, Longmire investigated the murder of Antar, who was Bey IV's older brother. Longmire met Bey IV during that investigation and also came to know his mother, Daulet Bey, and other Bey family members. During their acquaintance, Bey IV took Longmire to the upstairs, private area of the Bakery, where he sought Longmire's advice on obtaining contracts with the City to open a bakery at the Oakland airport. On another occasion, when Bey IV was under investigation for liquor store vandalism in 2005, Daulet Bey called Longmire and asked him to become a mentor to Bey IV to stem the tide of his increasing criminality.

Longmire considered his relationship with Bey IV and other Bakery members simply to be good community policing. He maintains it helped him develop a rapport with the community that could and did serve him well in handling criminal investigations.

At least three OPD officers—Jesse Grant (who investigated the May 2007 kidnap-torture case), André Rachal (an officer in the intelligence section who specialized in monitoring the Bakery), and Dominique Arotzarena (who investigated the two 2005 incidents of liquor store vandalism)—thought Longmire's relationship with Bey IV was unprofessional and suspect. During the investigation of Longmire's conduct of the Bailey investigation Assistant Chief of Police Howard Jordan[1] also developed some concerns about whether Longmire could effectively and objectively conduct the Bailey investigation. Jordan explained his concerns arose out of "rumors and innuendos" about Longmire's involvement with the Bakery, as well as information he had received from lower-ranking officers such as those just named. Jordan mentioned that Longmire had at times dressed in a suit and bowtie at work, the trademark garb of the Bakery members, and some people at OPD may have "drawn their own inference." It was "common knowledge" within OPD that Longmire was associated with the Bakery. Jordan did not think it was appropriate for an OPD officer to have a personal relationship with Bakery members because he regarded the Bakery as a "criminal organization."

### *Longmire's Reputation before the Bailey Murder*

Longmire was a 22-year veteran of the OPD who had served without discipline before the Bailey murder. It is undisputed that Longmire had an excellent reputation as an investigator prior to the Bailey case. He was dedicated to his work and was well respected in the district attorney's (DA) office. In fact, he was regarded as the best interviewer in the homicide section, with a particular talent for getting confessions. Several interviewees mentioned, however, that he was less consistent with follow-up and thoroughness.

---

[1] Jordan was assistant police chief from July 1, 2007 until February 28, 2009. From then until October 19, 2009, he was acting chief of police. On that date, Anthony Batts was hired as chief of police. Jordan was again appointed acting chief of police two years later when Batts resigned. Jordan was promoted to chief of police in February 2012. We attempt to designate his rank at the time of each of the statements or actions recorded in the text. Our use of last names of officers without designating their rank is not intended as a sign of disrespect.

The parties agree that the job of a police officer includes creating relationships with people in the community, and Longmire was good at that. Longmire admitted he had established a relationship with Bey IV and other members of the Bakery based on prior police contacts. But he believed, after building rapport with Bakery members, he could use them to monitor the criminal element and get confessions or other information helpful to the police.

### *The Bailey Murder and Its Investigation*

On the morning of August 2, 2007, Chauncey Bailey was gunned down on an Oakland sidewalk on his way to work. Longmire was assigned as the primary investigator based on a scheduled rotation, with Inspector Louis Cruz assigned as his partner.

By the afternoon of August 2, members of the Bakery were considered suspects in the murder. Bailey, police discovered, had written stories about problems at the Bakery in the past and was working on another story that would portray the Bakery in an unfavorable light, possibly "exposing the bakery and their financial dealings and fraud with city officials."

In the early morning hours of August 3, 2007, Oakland police conducted a massive raid on the Bakery based on search warrants issued in connection with investigations that were underway before the Bailey murder. The shotgun used to kill Bailey, as well as evidence relating to other crimes were recovered in the raid. Bey IV, Bakery handyman Devaughndre Broussard, and others were taken into custody.

While conducting custodial interviews, Longmire and Cruz made a joint decision to place Bey IV and Broussard in a room alone together, without recording or monitoring the conversation. Cruz described this as a "last gasp tactic" he had used in the past. After approximately six minutes alone with Bey IV, Broussard confessed to Bailey's murder, claiming to have acted alone. Longmire suggests Bey IV talked Broussard into taking the fall for Bailey's murder by convincing him the Bakery was "bigger than all of them."

Broussard was charged with Bailey's murder on August 7, 2007. After that, Longmire contends, the DA's office took over the investigation of the Bailey murder. Assistant DA Thomas Rogers was initially assigned to the case. Based on Rogers's testimony, Longmire contends it was DA Tom Orloff who decided to charge Broussard for the Bailey murder, but not Bey IV. The DA's office saw no urgency to further investigate any link between Bey IV and the Bailey murder, as Bey IV was being prosecuted for the kidnap-torture case. Rogers believed Bey IV and Broussard both would be in prison for the rest of their lives.

On August 6, 2007, in response to Rogers's suggestion, Inspector Jesse Grant, then a robbery investigator in the criminal investigations division of the OPD who was in charge of the kidnap-torture case, placed Bey IV in an interview room with other Bakery members who were also suspects in that case. Bey IV not only implicated himself in the kidnap-torture case on a video recording of their conversation, but also made statements showing he knew details of the Bailey murder.

### *The Chauncey Bailey Project*

Because Bailey was a journalist killed for reporting on a controversial topic, the case received heavy media attention. A coalition of about three dozen journalists formed the "Chauncey Bailey Project" (the Project), which actively worked to investigate and expose the circumstances of Bailey's murder and its investigation. Over the ensuing months and years, the Project published numerous articles on related topics.

### *The Broussard Complaint*

Broussard's belatedly devised defense strategy was to distance himself from his initial confession. To that end, Broussard's attorney, LeRue Grim, publicly challenged the legality of his client's confession, contending it was coerced. Grim further charged that Longmire was protecting Bey IV from prosecution. On August 9, 2007, a citizen's complaint was made on Broussard's behalf to the internal affairs division (IAD) of the OPD that Longmire beat a confession out of Broussard to protect Bey IV.

Both Grim and the Project widely publicized claims that Longmire had botched the investigation. Grim released Longmire's homicide investigation file to the media.

6

This ignited public scrutiny of the investigation and raised questions about Longmire's relationship with Bey IV. For instance, the homicide file included a taped custodial interview of Bey IV on August 3, 2007 in which Bey IV described Longmire as a longtime patron of the Bakery and a "good supporter." At the same time, the file did not include a copy of the August 6 video recording in which Bey IV made damaging admissions, and there was no documentation of GPS tracking evidence that showed Bey IV's car was parked in front of Bailey's house the night before the murder and was at the murder scene 20 minutes after it happened. Jordan had concerns, too, about whether there had been adequate follow-up on the Bailey investigation.

By late 2007, the investigation into Broussard's allegations of misuse of force by Longmire showed them to be unfounded. No disciplinary action was taken against Longmire, and he was not placed on administrative leave based on Broussard's allegations.

### The Grant Complaint

Grant was one of the OPD officers who, even prior to the Bailey murder, was suspicious of Longmire's relationship with members of the Bakery based on what he perceived to be Longmire's overly friendly interactions with Bey IV and others at the Bakery. In Grant's eyes this was inappropriate and unprofessional.

Grant's suspicions were further aroused during his investigation of the Bakery-related kidnap-torture case. During that investigation, Grant became increasingly concerned that Longmire, who was assigned to the homicide section, had taken an unusually keen interest in Grant's kidnap-torture investigation and the Bakery members that Grant brought in for questioning. Grant's concerns intensified after the August 6, 2007 video recorded conversation between Bey IV and other Bakery members in which Bey IV discussed details of the Bailey homicide and boasted that Longmire was protecting him from prosecution for its commission.

In September 2007, Grant approached Captain Jeffrey Loman, head of the criminal investigations division, to express his concerns, but no action was taken. Grant continued to observe through late 2007 and early 2008 that Longmire had a close

relationship with Bey IV: (1) Longmire continued to take a special interest in Bakery members Grant brought in for interrogation on other cases; (2) Longmire allegedly poked his head into Grant's interview room while he was questioning a Bakery member and allegedly tried to eavesdrop on Grant's interviews; (3) Longmire advocated on behalf of Alaia Bey, Bey IV's wife, for return of property seized during the raid on August 3, 2007; and (5) Bey IV communicated with Longmire from jail, asking him to find out why Grant was pursuing him on the kidnap-torture case. Grant believed Longmire's relationship with Bey IV led him to interfere with Grant's investigations and, inferentially, compromised Longmire's objectivity in connection with crimes committed by Bakery members. Longmire disputes Grant's accusations, inferences and interpretations. Nevertheless, in April 2008, Grant reported his concern about Longmire to Assistant Chief Jordan. Grant ultimately declared under oath that he knew nothing about Longmire's religious affiliation and did not believe Longmire was a Muslim.

### The Initial Internal Investigation of the Grant Complaint

Upon hearing Grant's complaint, Jordan initiated an IAD investigation, in accordance with OPD policy. Longmire agrees Grant's allegations were serious and it was proper for Jordan to refer them to IAD. He does not claim conducting an investigation in and of itself was discriminatory.

Sergeant Robert Chan of OPD's IAD was initially assigned to investigate Grant's allegations on April 9, 2008. Chan reported his preliminary findings to Assistant Chief Jordan in a memorandum dated June 27, 2008. He also wrote additional reports to Jordan on August 14, 2008 and October 4, 2008.

Longmire was not satisfied with that investigation. He complains Chan never interviewed him and did not obtain a copy of his Bailey homicide investigation file. Longmire also points out that Chan failed to determine (1) if Longmire was still assigned the Bailey case after Broussard was charged, (2) if the DA's office was in charge of the investigation after Broussard was charged, or (3) if the DA's office was still investigating the case. Yet, Chan met with members of the Project on three occasions during his investigation. Longmire further complains that Chan also interviewed other officers who

were suspicious of Longmire, even though they had no knowledge of the Bailey investigation, and yet he did not interview Longmire's supervisor Lieutenant Ersie Joyner or Assistant DA Rogers, who were supportive of Longmire.

Chan also met with Inspector Cruz, Longmire's partner on the Bailey investigation, on or about October 2, 2008. During the interview, Cruz got the impression that Chan thought Longmire was a Muslim because Chan asked Cruz about Longmire's having sometimes worn bowties to work, and Chan also directly asked Cruz whether Longmire was a Muslim. Longmire claims Cruz "knew" Longmire had not compromised the Bailey investigation. An investigation later conducted by the California Department of Justice (DOJ) included some observations by Cruz suggesting Cruz was not as fully supportive of Longmire as Longmire thinks he was. Cruz did, however, testify at his deposition that he did not believe Longmire had compromised the investigation up to the point when the warrant was served; he said he could not express an opinion about what happened thereafter.

### *Intensified Media Scrutiny*

In June 2008, the Project posted on the Internet a copy of the August 6, 2007 video-recorded conversation between Bey IV and other suspects in the Bakery-related kidnap-torture case. On October 25–27, 2008, a three-part front page exposé by the Project appeared in the Oakland Tribune and Contra Costa Times alleging that Longmire compromised the Bailey murder investigation to protect Bey IV from prosecution. The articles included confidential information (which Longmire believes was provided by Grant), coupled with information probably leaked by Grim regarding the homicide investigation.

On October 27, 2008, Rogers left a voicemail message for Lieutenant Joyner in reaction to the articles, reassuring Joyner that Rogers was not the source of the information contained in those articles. Joyner played the voicemail for his supervisor, Captain Jeffrey Israel, and both men then met with Jordan and played the voicemail for him. Longmire places great emphasis on this voicemail, characterizing it as "exculpatory" evidence. Rogers did say in the message that the newspaper articles were

9

"unfair," that it was "good police work" to get a confession from Broussard, and that Rogers believed "every individual" in the "homicide department" was "very professional."

As public scrutiny of the Bailey homicide investigation and Longmire's relationship with Bey IV intensified, Jordan defended Longmire's performance. First, during an interview on the Bailey homicide conducted by the CBS news program "60 Minutes," which aired in February 2008, Jordan defended Longmire when he was questioned about Longmire's relationship with Bey IV and the Bakery. Jordan explained, "I don't have any problem with Sergeant Longmire's relationship with members of the Bakery. I trust his integrity, I trust his credibility."

Second, in November 2008, upon Joyner's request, Jordan authorized a press release that set out the reasons the OPD (up to that point) did not believe Longmire had compromised the Bailey investigation.[2] As part of that press release Jordan denied there had been any impropriety in Longmire's not having the GPS tracking evidence in the Bailey investigation file, denied that the search warrants for Bey IV's phone had been inadequate, and denied that Longmire had interfered with other police investigations of the Bakery.

Throughout the initial phase of the investigation by IAD, Longmire remained on duty as a homicide detective, but he was transferred to patrol duty on February 1, 2009. OPD claims this move was in accordance with OPD transfer policy because Longmire had "termed out" of his homicide assignment. Longmire disputes the policy is routinely enforced but does not contend his transfer was an adverse employment action.

### The Department of Justice and Outside Internal Affairs Investigations of the Bailey Case

In late October 2008, as public scrutiny intensified, then Oakland Mayor Ron

---

[2] Despite the confidence expressed by Jordan, Longmire complains that a department-wide gag order, imposed in October 2007, precluded any OPD personnel other than the chief or assistant chief from talking about the Bailey case. This, he contends, resulted in harm to his reputation and prevented him from responding to challenges to his integrity.

Dellums requested that the DOJ conduct a concurrent investigation of OPD's handling of the Bailey murder investigation. The DOJ assigned Special Agent Supervisor John Porbanic to conduct the investigation. Porbanic described in a declaration his complete independence in conducting his investigation.

Porbanic reviewed volumes of documents, as well as five prior witness interviews; and personally conducted seven more interviews. On February 19, 2009, Porbanic interviewed Assistant Chief Jordan. Jordan expressed the view that Longmire had compromised the Bailey investigation because of his association with the Bakery, although he "could never prove" it. He said that "a year ago" he might have had a different opinion. Jordan told Porbanic, ". . . I don't see how you can form the conclusion that it's not affecting his ability to investigate the case thoroughly." Longmire complains that in the interview Jordan concealed (1) his supposed knowledge that the DA's office, not the OPD, made the decision not to further investigate Bey IV; (2) the October 2008 voicemail from Rogers to Joyner; and (3) other (unspecified) exculpatory information.

On February 26, 2009, Porbanic interviewed Longmire for approximately eight hours, during which time Longmire was represented by counsel and was unrestricted in his ability to share information with Porbanic. Porbanic also interviewed Joyner in connection with his investigation.

Around the time Mayor Dellums requested a DOJ investigation, the OPD also decided to turn its IAD investigation over to a neutral, outside investigator in order to safeguard public confidence in the OPD. OPD retained Wendell "Pete" France, an independent internal affairs investigator located in Baltimore who had previously been a police commander, to finish its investigation. France received no direction from OPD on how to analyze the evidence or what conclusions to reach. He reviewed and analyzed all of the evidence collected by the IAD and the DOJ, as well as conducting a limited number of independent interviews.

11

### *The Results of the Investigations*

In April 2009, Porbanic and France both completed their investigations. The results of the Porbanic investigation were submitted in a 65-page report to IAD Captain Whent on April 8, 2009. The France investigation resulted in a 19-page report also presented to the OPD in April 2009.

Both investigators concluded Longmire had compromised the investigation of the Bailey murder, probably as a result of his personal relationship with Bey IV. Both reports also sustained the allegation of "insubordination" or the equivalent[3] based on findings that Lieutenant Joyner had ordered Longmire to document each contact he had with Bey IV, and Longmire failed to do so.[4] There were several other allegations in the Porbanic investigation that were "not sustained."

Longmire points out that on April 13, Whent met with Jordan and told Jordan that, based on the "written documentation" alone, Whent had concerns whether the Porbanic and France findings were "well supported." Nevertheless, on the two items upon which both investigators concurred, Whent told Jordan "the preponderance of the evidence was there." Jordan sustained two allegations: compromising a criminal case and insubordination. Whent subsequently prepared a written memo summarizing the basis for Jordan's decision to sustain the two allegations.

With regard to compromising a criminal case, Jordan stated in a declaration that he relied on the following factors:

– Longmire failed to include evidence in his Bailey murder investigation file that implicated Bey IV. Specifically, Longmire's file included no indication of the GPS

---

[3] An allegation of insubordination had not been included in the DOJ investigation, but the subject matter of the complaint was covered, with a "performance of duty" allegation being sustained on the same basis as the insubordination claim in the IAD investigation.

[4] Longmire submitted evidence at the *Skelly* hearing (*Skelly v. State Personnel Board* (1975) 15 Cal.3d 194; *Skelly*) and in opposition to the summary judgment motion that he kept a record of his communications with Bey; the parties disagree whether he documented all contacts.

tracking on Bey IV's car which had put Bey IV in front Bailey's house the night before the murder and at the scene of the murder 20 minutes after it happened.

– Longmire's file also included no evidence reflecting Bey IV's video-recorded statements while talking with his Bakery friends on August 6th, even though that recording included Bey IV's recitation of specific details of Bailey's murder (e.g., how Bailey's body reacted to the shotgun blasts), the location of the murder weapon, and the details of Broussard's confession.

– Longmire failed to take basic investigatory steps in the preparation of a search warrant for Bey IV's cellular telephone by failing to list his phone number and failing to request any cell site information that could have identified the location of the cell phone user.

– Longmire failed to take basic investigatory steps in the execution of the search warrant for Bey IV's cell phone by not actually searching for the phone when the search warrant was executed, instead relying on Bey IV's wife's statement that she did not know where the phone was.

With regard to insubordination, Jordan relied on the following factors:

– Longmire had been ordered to document all of his contacts with Bey IV from jail. This order arose after Longmire engaged in a three-way phone call with Bey IV and his wife in June 2008 during which Bey IV expressed concern that Longmire was succumbing to media pressure. After Longmire hung up, Bey IV told his wife that any other investigator would have charged him with Bailey's murder.

– After receiving an order to document all of his contacts with Bey IV from jail, Longmire continued to fail to do so. Longmire also admittedly had an undocumented communication with Bey IV in which Longmire permitted Bey IV to discuss their friendship on a "Free the Bakery Brothers" Web site and to post Longmire's picture.[5]

---

[5] Longmire denies authorizing Bey IV to post his photograph, but admits he authorized Bey IV to write about their relationship on the Web site. Jordan found Longmire's appearance on Bey IV's Web site brought the OPD into "disrepute."

Whent sent a letter to Longmire dated April 13, 2009, notifying him of the internal affairs findings sustained by Jordan.

Longmire disputes the foregoing reasons for imposing an administrative leave by providing explanations and excuses for his alleged failings. He also criticizes the investigations in general, pointing out that Porbanic and France both failed to interview the two prosecutors who supervised the DA's Bailey homicide investigation (Rogers and Deputy DA Christopher Lamiero) and failed to get their opinions on whether Longmire's activities compromised the investigation or the prosecution. Had Rogers been interviewed, Longmire claims, he would have told investigators that Longmire should have been given more credit for having obtained the Broussard confession, rather than being criticized for his work on the case.

But in his declaration, Porbanic described a meeting he attended with DA Tom Orloff, Lamiero and two investigators from the DA's office. During that meeting the investigators informed Porbanic that "Longmire had a history of lack of thoroughness and follow-up with his cases . . . ." Porbanic's "impression" was that "they were attempting to largely re-create the investigation so as to minimize Longmire's involvement at trial." On the other hand, Rogers in his deposition was somewhat critical of the upper command at OPD during that time, and felt the investigation of Longmire was "unfair" and possibly "politically motivated."

### *The Administrative Leave and Proposed Termination on the Bailey Investigation*

Effective April 13, 2009, Jordan, in the exercise of his discretion, placed Longmire on paid administrative leave pending disciplinary procedures. On May 1, 2009, Jordan sent Longmire a letter informing him that Jordan intended to recommend to the city administrator that Longmire be terminated. Jordan based his recommendation on the OPD's discipline matrix, which (Longmire does not dispute) identified termination as the appropriate level of discipline.

14

*The Skelly Hearing in the Bailey Internal Affairs Case*

Longmire exercised his right to a pretermination due process hearing under *Skelly, supra.*, 15 Cal.3d 194. OPD Captain Anthony Toribio was appointed as the *Skelly* hearing officer.

Longmire's attorney for the *Skelly* hearing, Michael Rains, prepared a 60-page, single-spaced letter on July 9, 2009 to Toribio outlining various complaints about alleged procedural irregularities in the investigations. Rains's letter also included a factual argument that Longmire did not compromise the Bailey investigation.

After reviewing the evidence in light of Rains's letter, Toribio concluded the IAD and DOJ investigations failed to support the findings. Toribio commented in his deposition that there was no analysis of the evidence, no credibility assessment, and some witnesses were not interviewed.

On July 23, 2009, Toribio met with Jordan and informed him of his opinion that the findings should be changed to "not sustained" and Longmire should not be terminated. That same day, Jordan adopted Toribio's recommendation and informed the city administrator that he was withdrawing his recommendation for Longmire's termination. He then awaited the city administrator's decision, since in cases of potential termination the decision is made at that level.

Longmire claims he should have been notified within 30 days that the *Skelly* hearing on the Grant complaint resulted in a finding that the allegations with regard to the Bailey investigation were not sustained. This, he argues, should have resulted in his being returned to work by August 23, 2009. He was not returned to work until December 23, 2009. He claims he did not in fact learn of Jordan's "not sustained" finding until sometime in 2010. Longmire was never disciplined for his conduct in the Bailey investigation.

*The Medeiros Complaint*

In February 2009, while the Bailey investigations into Longmire's performance were ongoing, Lieutenant Brian Medeiros replaced Lieutenant Joyner as supervisor of the homicide section. Entering his new command, Medeiros reviewed open files left by

15

officers who had recently transferred out of homicide. Medeiros noticed a "systematic lack of follow-up" investigation in ten homicide cases that had been assigned to Longmire and that remained open.

In March 2009, Medeiros referred the matter to IAD. IAD initiated an investigation into Longmire's handling of those cases. Although Jordan had "sustained" the Medeiros allegations on July 3, 2009, the question of discipline was still pending in July 2009, when Jordan decided to withdraw his recommendation for termination of Longmire on the Bailey investigation. Longmire was maintained on paid administrative leave pending completion of the Medeiros matter, at which time the OPD would decide whether any discipline was warranted for one or both cases.

### The Juarez Investigation of the Medeiros Internal Affairs Complaint

The Medeiros complaint was assigned to Sergeant Ed Juarez of IAD for investigation. Juarez determined that Lieutenant Joyner was satisfied with Longmire's performance during the entire period Longmire was supervised by Joyner. Longmire argues, based on Juarez's deposition testimony, that it was highly unusual for a transferred officer to be investigated for misconduct based on a new supervisor's dissatisfaction with the officer's performance under a previous supervisor.

Longmire defends his work on the 10 cases questioned by Medeiros, arguing that (like all homicide investigators at the OPD) he had a high case load and had to prioritize his activities. Longmire further claims that, unlike other investigators who were transferred out of the homicide section, he was not allowed to continue working on his homicide cases after he left, implying he would have completed more work on the 10 cases if he had been allowed to do so.

On June 17, 2009, Juarez turned in his report on the Medeiros complaint. Juarez concluded Longmire had violated the OPD manual of rules pertaining to performance of duty because he did not complete basic investigatory follow-up in a timely manner. Specifically, Longmire did not process latent fingerprints in three cases, did not enter ballistics evidence into a database for potential matching to weapons used in other crimes in eight cases, and did not request records of 911 calls in five cases.

16

On July 3, 2009, Lieutenant Whent presented the case to Acting Chief Jordan. On the same date, Jordan approved the findings and sustained the complaint. Longmire contends, under OPD policy and practice, he should have been notified within 30 days that the allegations were sustained, but he was not notified until after he had been returned to work several months later.

### *Discipline Imposed Under the Medeiros Complaint*

The City explains that Longmire was kept on administrative leave while settlement discussions were conducted between the OPD, the City and Rains to negotiate a resolution with Longmire on the appropriate discipline. Longmire contends the City's representatives were focused on getting Longmire to sign a release, while withholding from him information about Jordan's disposition of the Grant and Medeiros allegations. In December 2009, Longmire refused to sign a proposed agreement that would have included a release of liability for the City and a five-day suspension for Longmire.

According to the City, when the discussions proved unsuccessful, Longmire was ordered back to work by the new police chief, Anthony Batts, in a letter dated December 21, 2009, with notice of a proposed 20-day suspension on the Medeiros complaint.

Again Longmire requested a *Skelly* hearing. Deputy Chief Brian Breshears was appointed as the *Skelly* hearing officer. That hearing, held February 11, 2010, resulted in the recommended discipline being reduced from 20 days' suspension to eight days. This conclusion was memorialized in a report dated September 24, 2010. On November 2, 2010, Chief Batts suspended Longmire for eight days without pay for investigatory neglect on eight of the 10 open cases.

Longmire contends that if the OPD's Discipline Matrix had been followed, he should have received discipline ranging from counseling at the low end to a one-day suspension at the high end. Whent, who testified in his deposition about the suspension, pointed out there was not just one violation, but violations in eight open cases, thus justifying a longer suspension. He testified Chief Batts was, in any case, authorized to exceed the recommended disposition under the Matrix. We assume for purposes of this appeal that the punishment was inconsistent with the Matrix.

17

*Longmire's Lawsuits*

In Apri1 2010, Longmire filed suit against the City, Jordan and Whent in federal district court alleging violations of title 42 of the United States Code sections 1981 and 1983 based on Longmire's treatment in connection with the Bailey and Medeiros investigations, claiming that his rights under the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution had been violated.  Specifically, Longmire alleged the City subjected him to disparate treatment based on his race and "perceived religion and association with the Bakery."  He based his claims on the theory that he had been "perceived as" a Black Muslim by his superiors and discriminated against for that reason.  This claim was dismissed at the pleading stage because such a theory is not recognized under federal law.  (*Guthrey v. Cal. Dep't of Corr. & Rehab.* (E.D.Cal. Aug. 7, 2012, No. 1:10-cv-02177-AWI-BAM) 2012 U.S.Dist. Lexis 89174, p. *16, fn. 2; *El v. Max Daetwyler Corp.* (W.D.N.C. May 9, 2011, No. 3:09cv415) 2011 U.S.Dist. Lexis 49645, p. *16 [". . . Congress has not enacted laws that would make adverse employment actions based on someone being *perceived* as having a religious affiliation, be it Catholic, Muslim, or any other religion, actionable under Title VII."].)

The remaining claims, based in part on racial discrimination, were disposed of by summary judgment in favor of the City on grounds, inter alia, that Longmire failed to show he had suffered an "adverse employment action" and failed to put forth evidence of pretext in response to the City's "undisputed facts demonstrat[ing] that the City had legitimate reasons for its conduct." (*Longmire v. City of Oakland* (N.D.Cal. Nov. 11, 2011, No. C 10-01465 JSW) 2011 U.S.Dist. Lexis 131183, at pp. *11, *17–19.)

Longmire filed the current action in July 2011, again complaining about his treatment in connection with the Grant and Medeiros investigations.  He named the City and 50 Doe defendants.  The complaint asserted two claims under the FEHA: (1) discrimination and harassment based on perceived religion, and (2) retaliation for internal complaints about due process violations and discrimination.

On May 25, 2012, the City filed a motion for summary judgment and summary adjudication.  Longmire filed opposing papers on September 20, 2012, but he did not

18

oppose the City's motion on the harassment theory or the retaliation claim. The trial court granted City's motion for summary judgment. The harassment theory and retaliation claim have also not been briefed on appeal. We therefore address only the discrimination cause of action based on perceived religious affiliation.

### *The Ruling on Summary Judgment*

On October 11, 2012, the Honorable John M. True III granted the City's motion for summary judgment.[6] The trial court's order reflected skepticism about the strength of Longmire's prima facie case and specifically rejected Longmire's contention that his placement on paid administrative leave qualified as an adverse action. The trial court further held that Longmire did not provide substantial responsive evidence that the reasons given by the City for his eight-day suspension were a pretext for discrimination.

The court ruled, "In this case, Plaintiff has not presented specific and substantial evidence from which a reasonable jury could find that the reasons given by Defendant for his suspension were not only false, but were proffered to cover up its discriminatory motive. If the evidence presented by Plaintiff is viewed in its most favorable light, a reasonable jury could find at most that those in leadership positions within the Department, and possibly also the DA's Office, were interested in framing him as the scapegoat when the public concluded that the Bailey investigation had not been properly handled. Plaintiff simply has not provided the Court with any evidence that would support a reasonable inference that Defendant subjected Plaintiff to an adverse employment action because of his perceived religion. Finally, the Court does not accept Plaintiff's assertion that Defendant's decision to place him on paid administrative leave during the IAD investigations constitutes an adverse employment action. (See *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 386 (*McRae*).)

---

[6] It may not be technically correct to say this judge "wrote the book" on the FEHA, but he did co-author a chapter entitled, "Discrimination Claims—In General" in Wrongful Employment Termination Practice: Discrimination, Harassment, and Retaliation (Cont.Ed.Bar 2d ed. 2013), as well as two other chapters dealing with disability and age discrimination. (*Id*. at pp. vii, 1.)

The recent decision of the Ninth Circuit Court of Appeals in *Dahlia v. Rodriguez* (9th Cir. 2012) 689 F.3d 1094, 1107, does not reflect a change in existing law.  In *Dahlia*, the court of appeals clearly indicated that its statements constitute dicta because it was expressly not deciding whether the plaintiff was subjected to an adverse employment action."

Judgment was entered for the City on October 19, 2012, and Longmire timely appealed.

## DISCUSSION

### *The Legal Standard Governing Motions for Summary Judgment*

A defendant moving for summary judgment is entitled to the requested relief if "there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" and is also entitled to summary adjudication of any cause of action that "has no merit."  (Code Civ. Proc., § 437c, subds. (c), (f).)  A defendant may meet its burden by showing that one or more essential elements of a cause of action cannot be established.  (Code Civ. Proc., § 437c, subds. (o)(1), (p)(2).)

A triable issue exists if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  If the defense sustains its initial burden, the burden then shifts to the plaintiff to produce evidence of "specific facts" showing a triable issue exists.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.)

A defendant may also prevail on summary judgment if it makes a showing there was a legitimate, nondiscriminatory reason for the complained-of employment decision and if the plaintiff fails to rebut that showing.  "A reason is ' "legitimate" ' if it is 'facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination.' [Citation.]  If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination."  (*Reid v. Google, Inc. (*2010) 50 Cal.4th 512, 520, fn. 2, italics omitted; see also *Mamou v. Trendwest Resorts, Inc. (*2008)

165 Cal.App.4th 686, 715.)  Although this imposes on the employee a burden of production, the burden of persuasion remains with the moving party.  (*Aguilar*, *supra*, 25 Cal.4th at pp. 850–851.)

An appellate court must conduct a de novo review of the record to determine whether there are any triable issues of material fact and whether the moving party is entitled to judgment as a matter of law.  (*Conte v. Wyeth, Inc. (*2008) 168 Cal.App.4th 89, 97; Code Civ. Proc., § 437c, subd. (c).)  The appellate court may affirm a summary judgment on any correct theory, even if the trial court relied on a different theory. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

In reviewing the record we must "liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc. (*2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).) While we draw all reasonable inferences in favor of the non-moving party, a reasonable inference " ' " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work' " . . . [but] must logically flow from other facts established in the action.' " (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 828, disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc. (*2002) 29 Cal.4th 53, 68, fn. 5; Evid. Code § 600, subd. (b).)

"[T]o avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004–1005.)  "[T]he employee [cannot] simply show the employer's decision was wrong, mistaken, or unwise.  Rather, the employee ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [asserted] non-discriminatory reasons.' "

21

(*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807 (*Horn*), italics omitted; see also *Reeves v. MV Transportation, Inc.* (2010) 186 Cal.App.4th 666, 674.)

We may not weigh the evidence or make credibility determinations. (*Aguilar*, *supra*, 25 Cal.4th at pp. 850, 854–856; *Horn*, *supra*, 72 Cal.App.4th at p. 805; Code Civ. Proc., § 437c, subd. (e).) We must nevertheless determine whether the evidence is sufficient to allow a reasonable trier of fact to find in the plaintiff's favor. (*Aguilar*, at p. 850.) In that regard, an inference from the evidence is reasonable only if it implies the existence of an element more likely than the non-existence of that element. (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 483; see *Aguilar*, at pp. 851–852.)

### The Elements of a Prima Facie Case of Discrimination Cannot Be Established

The FEHA makes it unlawful for an employer to discriminate against an employee because of, among other things, his or her "religious creed," an employer's "perception" about an employee's "religious creed," or an employee's "associat[ion]" with those of a particular religious creed.[7] (Gov. Code, §§ 12926, subd. (o), 12940, subd. (a).) Thus, elements of a prima facie case of employment discrimination under FEHA's protection of religious freedom are (1) membership (or perceived membership) in a protected class based on "religious creed", (2) competent job performance, (3) an adverse employment action, and (4) some circumstance suggesting a discriminatory motive for the adverse action. (*Guz v. Bechtel National, Inc. (*2000) 24 Cal.4th 317, 355 (*Guz*).)

Longmire's evidence falls short of demonstrating a triable issue of material fact on at least two elements of his prima facie case: (1) his membership in or perceived membership in a protected religious classification, and (2) an adverse employment action with respect to the Grant complaint.

---

[7] Although it is forbidden under FEHA to take an adverse action against an employee based on the employee's being "associated with a person who has, or is perceived to have" protected characteristics (Gov. Code, § 12926, subd. (o)), Longmire does not appear to rely on such a theory.

1. <u>Longmire possesses no substantial evidence the decision makers perceived of him as a Black Muslim</u>

Longmire is not a Muslim. The record also does not support a reasonable inference that Longmire was mistakenly perceived to be a Black Muslim by his superiors who initiated the IAD investigations (Jordan and Medeiros), who placed or maintained him on administrative leave and threatened to terminate him (Jordan), or who recommended the 20-day suspension and ultimately imposed the eight-day suspension (Batts). Though Longmire attempts to raise an inference that Chan, Porbanic and Grant all were under the mistaken impression that Longmire was a Black Muslim, such an inference is unfounded.[8] In his deposition, Chan flatly denied believing Longmire was a Black Muslim. And although Grant was critical of Longmire's relationship with Bakery members because he viewed them as dangerous criminals, he also filed a declaration denying he perceived Longmire to be a Muslim. The evidence overall does not lead to a reasonable inference that the investigators themselves perceived Longmire to be a Black Muslim.

Longmire claims Jordan, too, believed he was a Black Muslim, but there was no substantial evidence that either he or any of the other actual decision makers had that impression. Significantly, the City filed a declaration by Jordan in support of its summary judgment motion that was directly probative of Jordan's lack of such a perception, stating flatly, "I have never believed that Longmire was a Muslim or a member of the Bakery. I did, however, come to believe that his judgment may have been compromised because of his relationship with Bey IV." The City also showed through the Porbanic report, the France report , the Medeiros complaint, and the Juarez report

---

[8] With respect to Chan and Porbanic, Longmire rests his conclusion on the fact that they asked questions of interviewees about whether the interviewees thought Longmire was a Black Muslim and about his wearing a bowtie on occasion. Such questions asked by investigators does not raise a reasonable inference that the investigators themselves held such a belief.

there were legitimate, nondiscriminatory reasons for putting Longmire on administrative leave and eventually suspending him for eight days.

In response, Longmire quotes one question and answer from Jordan's deposition testimony, including only the italicized portion of the following excerpt:

"Q: At those meetings [about the Bailey investigation], did the issue ever come up regarding concerns about Sergeant Longmire being assigned to do the investigation because of his perceived association with the Black Muslim religion?

"A: No.

"Q: Did it ever come up that there were concerns because of his perceived association with the Black Muslim Bakery?

"A: No.

"*Q: At the time of the Chauncey Bailey murder, did you believe that Sergeant Longmire was associated with the Black Muslim religion?*

"*A: Yes.*

"Q: Why?

"A: I had spoken to André Rachal in the past, who is our intelligence officer assigned to intel, and he was our subject matter expert on the bakery. I had spoken to Jeff Loman in the past about his association . . . and Derwin's association with the bakery.

"Q: What were you told?

"A: That Derwin is friends with members of the bakery.

"Q: And what did you understand that to mean?

"A: That he is friends with them.

"Q: There is friends and there is friends. Did you understand that there was some special relationship here?

"A: I was not aware of that."

This was the only evidence Longmire presented to show he was perceived to be a Black Muslim by any of those who contributed to the decision to discipline him. Jordan's answer reflected the ambiguity of the question, which asked only whether Jordan perceived that Longmire was "associated with" the "Black Muslim religion." The

24

question did not ask whether Jordan thought Longmire "was a Black Muslim," was a "member" of a Black Muslim organization, or subscribed to the "religious creed" of Black Muslims.[9] Jordan's deposition standing alone makes it reasonably clear that Jordan perceived of Longmire as being "associated with" the "Black Muslim religion" only because of what others told him, which amounted to nothing more than that Longmire was friends with Bakery members.

On the other hand, when Jordan was asked more pointedly during his deposition whether he believed Longmire "was a member of Your Black Muslim Bakery," he responded that he "never believed" that. The next question was, "What about the Black Muslim religion or Nation of Islam?" Jordan responded, "I had no opinion about that."

The evidence considered in its entirety did not raise a triable issue that Jordan or any other decision maker at OPD thought Longmire was a Black Muslim. It would be unreasonable to draw such an inference in light of the whole record. (See *Horn*, *supra*, 72 Cal.App.4th at p. 805.)

Nor was there evidence that another decision maker at OPD, such as Batts or Medeiros,[10] believed Longmire was a Black Muslim.[11] Longmire presented no evidence

---

[9] In the realm of religious discrimination, it is the employee's subscription to particular religious principles, or a "religious creed," that triggers the protection afforded by FEHA. (See *Friedman v. Southern Cal. Permanente Medical Group* (2002) 102 Cal.App.4th 39, 70 [veganism not a "religious creed"].) California Code of Regulations, title 2, section 7293.1 defines "religious creed" as follows, " 'Religious creed' includes any traditionally recognized religion as well as beliefs, observations, or practices which an individual sincerely holds and which occupy in his or her life a place of importance parallel to that of traditionally recognized religions."

[10] Longmire appears to argue that the discipline was discriminatory because his previous supervisor, Lieutenant Joyner, was satisfied with his performance, while Medeiros found reason for dissatisfaction. But evidence of different performance standards between supervisors does not raise a reasonable inference that the stricter supervisor was motivated by discriminatory animus. (See *McCann v. Tillman* (11th Cir. 2008) 526 F.3d 1370, 1377.) "Different supervisors may insist upon different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important." (*Ibid.*)

25

to satisfy his burden of production on the alleged fact that he was a member of a protected class, namely a follower or perceived follower of the Islamic faith.

     2.     <u>Adverse employment action with respect to the Grant complaint</u>

Under the FEHA, an employee seeking to recover for unlawful discrimination must demonstrate he was subject to an adverse employment action that materially affected the terms, conditions and privileges of employment. (*McRae, supra,* 142 Cal.App.4th at p. 386.) " 'A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient.' " (*Ibid.*) Rather, the employee must show that the employer's actions had a substantial and detrimental effect on the plaintiff's employment. (*Ibid.*)

The actions about which Longmire complains are that he was (1) put on paid administrative leave and kept on administrative leave longer than warranted under OPD policy, (2) threatened with termination based on the France and Porbanic reports (even though the termination never occurred), and (3) threatened with a 20-day suspension and actually suspended for eight days after the Medeiros investigation, in violation of OPD policy. He further complains that the City tried to extract from him a release of liability following the investigations, and during the administrative leave, evidently withholding from him the outcome of the investigations during the negotiating process. The only one of these decisions that would generally be considered actionable is the eight-day suspension.

The case most closely on point is our own prior decision in *McRae*, *supra*, 142 Cal.App.4th 377. There we reversed a jury verdict for the employee on a FEHA retaliation claim, holding she was not subjected to an adverse employment action as a

---

[11] Medeiros ultimately filed a declaration stating he did not believe Longmire was a Black Muslim, and perceived religion played no part in his complaint about Longmire's investigational oversights. The trial court did not consider this evidence, however, because it was submitted with defendant's reply papers. (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316.) We also need not consider it to reach our conclusion.

26

matter of law. (*McRae*, at p. 386.) The employee, an African-American surgeon employed within the state prison system, claimed she was aggrieved by a series of employment decisions over the course of a year that included (1) two memoranda criticizing the doctor for leaving her post at the emergency room unattended; (2) a nonpunitive "letter of instruction" on attendance issues; (3) an internal affairs investigation for disobeying a direct order from her supervisor to contact a patient's distraught family, and for her reported order to withhold antibiotics from an HIV patient who had been admitted with pneumonia, without first examining the patient; (4) a recommended 30-day suspension based on the results of the investigation, which was never implemented; and (5) an involuntary transfer to a different facility nearby. (*Id.* at pp. 383–385.) McRae claimed these acts were in retaliation for her having filed a complaint about race discrimination with the Department of Fair Employment and Housing when she had not been selected for the position of chief medical officer at a nearby facility. (*Id. at* p. 382.)

We held, whether considered individually or as part of a continuous course of conduct[12] (see *Yanowitz*, *supra*, 36 Cal.4th at p. 1055), the foregoing actions did not

---

[12] Longmire cites *Yanowitz*, *supra*, 36 Cal.4th at page 1055 in support of his argument that the series of acts by his superiors at OPD constituted an adverse employment action. But in *Yanowitz*, two specific superiors in the employer's company embarked on a "campaign" of retaliatory acts "meant to punish [the employee] for her failure to carry out her supervisor's [illegal] order, [and thereby] placed her career in jeopardy." (*Id*. at p. 1060.) The combined actions involved public ridicule, unwarranted negative performance evaluations, and undermining the employee's relationships with those she supervised, which created a hostile or abusive work environment (*id*. at pp. 1052–1053), leading her to eventually leave her job and sue. (*Id*. at pp. 1035, 1065.)

We find *Yanowitz* distinguishable on some of the same grounds we recited in *McRae*, including that the discipline in this case resulted from the accusations, investigations, findings, and recommendations of numerous individuals within and outside of the OPD. (See *McRae*, *supra*, 142 Cal.App.4th at p. 391.) Longmire submitted no evidence that he was forced to undergo public humiliation at the hands of his superiors or that his work environment became hostile or abusive, as did Yanowitz. Nor was Longmire's career "placed in jeopardy" by the eight-day suspension, as was Yanowitz's. We find *McRae* more comparable to this case than *Yanowitz*. There was

amount to an adverse employment action. (*McRae*, *supra*, 142 Cal.App.4th at p. 390.) We specifically rejected the proposition that an investigation and a recommendation for discipline that was not implemented amounted to an adverse action. (*Id. at* p. 392.) That holding governs our decision that the internal affairs investigations and threatened termination could not support his discrimination claim.

The great weight of federal authority also rejects the notion that placement on administrative leave during an internal investigation into misconduct, without attendant discipline, amounts to an "adverse employment action."[13] (See, e.g., *Kuhn v. Washtenaw County* (6th Cir. 2013) 709 F.3d 612, 625–626 [internal investigation into rape allegation was not adverse action]; *Brown v. City of Syracuse* (2d Cir. 2012) 673 F.3d 141, 150 [paid administrative leave and loss of overtime pay not adverse action unless " 'the employer takes actions beyond an employee's normal exposure to disciplinary policies' "]; *Higgins v. Gonzales* (8th Cir. 2007) 481 F.3d 578, 587 [recommendation of termination that was not implemented was not adverse employment action]; *Joseph v. Leavitt* (2d Cir. 2006) 465 F.3d 87, 91–92 [paid leave during internal affairs investigation and continuation on paid leave after criminal charges were dismissed were not adverse actions]; *Singletary v. Missouri Dept. of Corrections* (8th Cir. 2005) 423 F.3d 886, 889, 891–892 [three months' paid leave pending internal affairs investigation and extension of employee's probationary period after return to work were not adverse actions]; *Peltier v. United States* (6th Cir. 2004) 388 F.3d 984, 988–989 [paid leave during internal investigation, including greater scrutiny on female employee than on male, were not adverse actions]; *Breaux v. City of Garland* (5th Cir. 2000) 205 F.3d 150, 157–158 [paid

---

also the issue of press coverage in this case—which led to much of Longmire's misery—but which was beyond the control of his employer.

[13] We also note that *Dahlia v. Rodriguez* (9th Cir. 2013) 735 F.3d 1060 (en banc) (*Dahlia II*) applied a "deterrence test"—which identifies a broader scope of actions as "adverse" in federal retaliation claims. (*Id*. at p. 1078.) The California Supreme Court, however, expressly rejected that test in *Yanowitz*, *supra*, 36 Cal.4th at pp. 1051–1052; see *McRae*, *supra*, 142 Cal.App.4th at p. 386.) We, of course, are bound by California Supreme Court authority. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

leave and investigation of police officer's misconduct based on purportedly false accusations]; *McInnis v. Town of Weston* (D.Conn. 2005) 375 F.Supp.2d 70, 84–85 [internal investigation into police officer's handling of criminal investigations].)

Longmire argues, however, that his placement on paid administrative leave—or at least being kept on administrative leave for an unduly long time—was an adverse action under a recent Ninth Circuit decision, *Dahlia II*, *supra*, 735 F.3d 1060. Dahlia was a police officer who filed a First Amendment retaliation complaint under title 42 of the United States Code section 1983, alleging he had been retaliated against for voicing objections to physical assaults of robbery suspects undertaken by other police officers who outranked him. (*Dahlia II*, at pp. 1063–1065 & fn. 2.) He alleged a number of retaliatory acts besides being placed on administrative leave, including physical threats and intimidation by superiors. (*Id. at* pp. 1064–1065.) The federal district court dismissed Dahlia's case under rule 12(b)(6) of the Federal Rules of Civil Procedure (28 U.S.C.), for failure to state a claim because (1) his speech "was not subject to First Amendment protection because he had a professional duty, as a matter of California case law, to report misconduct"; and (2) "Dahlia's placement on administrative leave did not constitute an 'adverse employment action.' " (*Dahlia II*, at p. 1063.)

The Ninth Circuit panel that heard the case "reluctantly affirmed,"[14] opining in dicta that placement on administrative leave and the resulting consequences, "if proven, . . . may very well constitute an adverse employment action." (*Dahlia v. Rodriguez*, *supra*, 689 F.3d at p. 1107.) A rehearing en banc was granted, with the opinion being filed after the appellant's opening brief was filed in this case. The Ninth Circuit en banc held: "We have not previously decided whether placement on administrative leave

---

[14] The panel considered itself bound by *Huppert v. City of Pittsburg* (9th Cir. 2009) 574 F.3d 696 (*Huppert*), which narrowly defined the scope of First Amendment rights of police officers whose speech may be deemed to have been made in their professional capacities. (*Dahlia II*, *supra*, 735 F.3d at p. 1066.) The panel voiced the opinion that *Huppert* was wrongly decided, and further disagreed (in dicta) with the second ground upon which the dismissal had been predicated, namely, that placement on administrative leave was not an "adverse employment action." (*Dahlia II*, at p. 1066.)

constitutes an adverse employment action. See *Lakeside–Scott v. Multnomah County*, 556 F.3d 797, 803 n.7 (9th Cir. 2009) (noting that 'being placed on administrative leave might qualify as an adverse employment action' but declining to reach the issue because it had not been properly preserved for appeal). Dahlia's assertions—that administrative leave prevented him from taking the sergeant's exam, required him to forfeit on-call and holiday pay, and prevented him from furthering his investigative experience—if proved, would constitute an adverse employment action. The inability to take a promotional exam, loss of pay and opportunities for investigative experience, as well as the general stigma resulting from placement on administrative leave appear 'reasonably likely to deter employees from engaging in protected activity.' " (*Id.* at pp. 1078–1079.)

While *Dahlia II* lends support to Longmire's theory, we find it is not persuasive for several reasons. First, Dahlia alleged additional employment impacts that, "if proved," would contribute to the establishment of an adverse employment action. (*Dahlia II*, *supra*, 735 F.3d at p. 1079.) While *Dahlia II* was decided at the pleading stage, Longmire had the opportunity, and obligation, to produce evidence to support his allegations, yet he produced none.

Longmire argues in his opening brief that he, like Dahlia, was prevented from career advancement by having been placed on administrative leave: "By remaining on administrative leave he was denied further job opportunities that would give him additional experience and benefit his career." Such a conclusory allegation in an appellate brief, without support in the record, cannot form the basis for finding a triable issue on the "adverse employment action" element. Longmire also alleged in his complaint that he sustained "losses of earnings, promotions, bonuses and benefits," but he produced no evidence to support that allegation in response to the summary judgment motion. Once the City had demonstrated that Longmire could not prove at least one element of his prima facie case, Longmire was required to produce evidence supporting that element and could not rest on the allegations of his complaint. (*Aguilar*, *supra*, 25 Cal.4th at p. 849.)

30

Finally, *Dahlia II* decided only that "under some circumstances" paid leave may be an adverse action; it did not elaborate on what circumstances would be necessary to make it so. The case before us does not present circumstances similar to those in *Dahlia II*. Longmire presented no evidence of actual career ramifications from the administrative leave, nor did he produce evidence of threats or intimidation by superiors comparable to those alleged in *Dahlia II*.

We conclude the only adverse action at issue in this case was the eight-day suspension imposed by Chief Batts as a result of the Medeiros complaint. But even if there were a triable issue on whether the extended period of administrative leave could constitute an adverse action, the summary judgment in favor of the City would have to be affirmed based on our holding that Longmire has not shown he was a member of a protected class, and because the City has presented evidence of legitimate nondiscriminatory reasons for the actions taken, and Longmire has not borne his burden of producing countervailing evidence.

### *The City Put Forth Evidence of Legitimate, Nondiscriminatory Reasons for the Challenged Actions*

The FEHA does not prohibit employers from imposing reasonable discipline for employee behavior detrimental to the employer's interests. (Cal. Code Regs., tit. 2, §§ 7287.6, subd. (d), 7287.8, subd. (b).) Despite Longmire's claim to the contrary, the City presented legitimate, nondiscriminatory reasons for the challenged actions.

Because we consider the eight-day suspension to be the only adverse action at issue, we discuss that action first. As the new commander of the homicide section, Medeiros reasonably undertook to review open homicide cases left behind by officers who had recently transferred out. There was no evidence that Longmire was singled out for such review. It is undisputed that Medeiros reviewed the files of other officers who had recently transferred out, as well as Longmire's. The Medeiros complaint, the Juarez

31

report,[15] and the Breshears report on the *Skelly* hearing all provided Batts with a solid, objective basis for the discipline imposed.

Longmire admitted he failed to perform basic investigatory follow-up on eight of his 10 open homicide cases in a timely manner. Longmire has failed to show the City's nondiscriminatory explanations were false, much less pretextual.

Even assuming the City's actions other than the eight-day suspension could collectively constitute an adverse employment action, we still would find the City presented legitimate, nondiscriminatory reasons for the paid administrative leave, the unimplemented recommendation for termination, and the extension of the administrative leave beyond the conclusion of the relevant investigations.

Grant's complaint raised concerns about whether Longmire was improperly associating with criminal suspects, whether he had compromised the Bailey investigation, and whether he had interfered with other officers' investigations involving Bakery members. Longmire was not placed on leave at the outset of the investigation, but only after two separate investigators (France and Porbanic) concluded that he had compromised the Bailey murder investigation, probably because of his preexisting relationship with Bey IV. The reports further found Longmire was guilty of insubordination for failing to document all of his contacts with Bey IV.

As the lead homicide detective on a high profile murder case, Longmire's objectivity and professionalism were naturally of paramount concern to the OPD. Based on the Porbanic and France reports, Jordan had legitimate grounds to place Longmire on paid administrative leave pending a *Skelly* hearing, as well as to warn him of the potential termination. Jordan's declaration further indicates Longmire was kept on administrative leave after Jordan made his findings on the allegations because the city administrator was

---

[15] Longmire evidently does not believe IAD investigator Juarez was motivated by a discriminatory motive; he cites more than once Juarez's own belief that the deficiencies in Longmire's investigative work warranted merely a reprimand or a one-day suspension. Likewise, Longmire presented no direct evidence that former Chief Batts perceived him to be a Black Muslim and no circumstances from which a discriminatory motive might reasonably be inferred.

reviewing the case, Jordan was waiting for him to make a decision, and the parties were negotiating a potential settlement that would allow Longmire to serve any suspension imposed prior to returning to work. These reasons, like those for putting him on administrative leave to begin with, were facially neutral and nondiscriminatory, and they have not been rebutted.

### *There Is No Triable Issue of Fact that the City's Proffered Reasons were a Pretext for Discrimination*

1. Longmire was required to produce evidence not only that the City's reasons were false, but that they were a pretext for discrimination

The City's strong showing of legitimate, nondiscriminatory reasons for the challenged actions shifted the burden to Longmire to produce evidence that the City's stated reasons were pretextual. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 (*Morgan*).) "[T]o avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant*, *supra*, 57 Cal.App.4th at pp. 1004–1005.) Longmire, however, offered no evidence that the City's reason for the eight-day suspension was contrived, no direct evidence of intentional discrimination, and only the most ambiguous circumstantial evidence that any of the City's actions were taken for reasons other than as stated.

With respect to the eight-day suspension, Longmire admitted a number of his open homicide files revealed basic investigatory steps that had not been taken, arguing only that the neglect was excusable in light of his heavy caseload. And though Longmire treats the investigation as if it were an overreaction to a minor performance issue rather than grounds for discipline, he does not contend it was inappropriate for Medeiros to initiate an IAD investigation and gives no reason to believe Medeiros's complaint to IAD was motivated by religious discrimination. Breshears (as to whom Longmire presented

33

no evidence of religious intolerance or a belief that Longmire was a Black Muslim) emphasized that the investigatory failings, having occurred in unsolved homicide cases, "could have resulted in very serious harm to the community." He recommended that "the discipline [should] exceed[] the matrix ranges." He recommended an eight-day suspension. In these circumstances, Longmire offered no evidence that the City's reasons for the temporary suspension were pretextual.

" '[T]he plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." ' " (*Morgan*, *supra*, 88 Cal.App.4th at p. 68.) The plaintiff need produce only "very little" direct evidence of the employer's discriminatory intent to move past summary judgment, but when relying on circumstantial evidence, his showing must be "specific and substantial." (*Id. at* p. 69.)

To show pretext, "[i]t is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound. What the employee has brought is not an action for general unfairness but for . . . discrimination." (*Hersant*, *supra*, 57 Cal.App.4th at p. 1005.) The issue is not "whether the employer is wise, shrewd, prudent, or competent," but solely whether it acted from discriminatory animus. (*Ibid*.) Thus, Longmire cannot simply show that the City's decision was "wrong or mistaken." (*Ibid*.) Rather, he must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence . . . ." (*Ibid*.)

In other words, an employee must do more than raise the inference that the employer's asserted reason is false. (*Hicks v. KNTV Television, Inc. (*2008) 160 Cal.App.4th 994, 1003.) "[A] reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (*Ibid*., quoting *St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 515; accord, *Arteaga v. Brink's, Inc. (*2008) 163 Cal.App.4th 327, 343.) "[A]n employer is entitled to summary judgment if, considering the employer's innocent

explanations for its action, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz*, *supra*, 24 Cal.4th at p. 361.) Longmire has produced no evidence meeting these criteria.

2. Any perceived flaws in the investigations did not amount to evidence of pretext

Longmire contends the investigations of his handling of the Bailey case were inadequate or incomplete for several reasons, including that the prosecutors on the Bailey case were not interviewed and that Jordan did not disclose what Longmire considers "exculpatory" evidence to the investigators. But courts do not require that "the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking adverse employment action." (*Smith v. Chrysler Corp.* (6th Cir. 1998) 155 F.3d 799, 807.) Where, as here, the employer puts forth reasons for its employment decision that are "facially unrelated to prohibited bias," its "proffered reasons, if 'nondiscriminatory on their face' and 'honestly believed' by [the] employer, will suffice even if 'foolish or trivial or baseless' . . . ." (*Guz*, *supra*, 24 Cal.4th at p. 358, italics omitted, quoting *Kariotis v. Navistar Intern. Transp. Corp.* (7th Cir. 1997) 131 F.3d 672, 676.)

In support of the City's summary judgment motion, Jordan expressly disavowed any discriminatory considerations. "My race is African American. Neither Longmire's race or religious affiliation played any role in my decision to recommend his termination on the Bailey [IAD] investigation. I based my recommendation on the fact that two outside investigators both found evidence of misconduct by Longmire and upon our Department's Discipline Matrix which provides guidelines for the appropriate level of discipline to be imposed for various kinds of misconduct." Longmire produced no evidence directly contradicting that statement and only the most ambiguous and inconclusive evidence that Jordan even thought of Longmire as a Black Muslim. "Ambiguous evidence or inferences showing or implying conduct that is as consistent

with permissible" activity as with unlawful conduct is insufficient. (*Aguilar*, *supra*, 25 Cal.4th at p. 852.)

With respect to the Juarez and Breshears reports Longmire made no corollary claim of incompleteness. He did not even present any circumstantial evidence of discrimination by showing the reasons given for the eight-day suspension were false.

The evidence as a whole simply does not lend itself to a reasonable interpretation that the City's stated reasons were untrue or that the City acted with discriminatory motives. Any perceived weaknesses in the investigations relating to the Bailey case cannot reasonably lead to an inference that the disciplinary decisions on the Medeiros case were a pretext for discrimination.

3.    <u>There is no triable issue of material fact as to pretext based on the City's failure to follow internal policies regarding notice and discipline</u>

An employee may demonstrate pretext by showing he was treated differently from other similarly situated individuals outside the protected class (i.e., non-Muslims). (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 172.) In order to prevail on such a showing he would have to identify a non-Muslim (not perceived to be a Muslim) who was equally negligent in his investigations—in as large a number of cases—who was disciplined less severely. (*Ibid.* [similarly situated individual must have " ' "engaged in the same conduct without any mitigating or distinguishing circumstances" ' "].) Longmire has identified no such individuals.

He tries to fill this gap by demonstrating that the City deviated from notice requirements under OPD's internal policies and standard discipline guidelines. He contends, "Showing disparate treatment and policy enforcement is a permissible means to establish pretext." (*Wills*, *supra*, 195 Cal.App.4th at p. 172.) That may be true when there is some evidence that the disparate treatment was based on plaintiff's membership in a protected class. But where, as here, there are other nondiscriminatory explanations for the policy deviations, plaintiff has made no showing that he even belongs to a protected class, and his showing of a policy deviation is his only attempt to show pretext, summary judgment for the employer is appropriate.

Longmire complains he was not notified promptly when Jordan decided not to sustain the allegations regarding the Bailey investigation, and he was not informed promptly when the Medeiros allegations were sustained. He argues the City violated internal policies by failing to notify him within 30 days of the date of each decision. But a "mere failure to follow formal internal policies does not support a discrimination claim." (*Guz*, *supra*, 24 Cal.4th at p. 377 (conc. opn. of Chin, J.).) "The employer's failure 'to follow its own Manual . . . does not even hint that the real motive was . . . discrimination.' " (*Id. at* p. 378; see also *Randle v. City of Aurora* (10th Cir. 1995) 69 F.3d 441, 454.)

The City claims the delay in returning Longmire to work was due to its efforts to negotiate a settlement with him. Even if he was retained on administrative leave longer than he should have been under OPD policies, the City has presented evidence of a nondiscriminatory reason for prolonging the leave, and no basis for an inference of discriminatory motive has been shown by plaintiff. In these circumstances we affirm the summary judgment for the City.

For similar reasons, Longmire's claim that the eight-day suspension was inconsistent with the OPD discipline matrix fails to demonstrate pretext. The parties disagree as to whether the suspension was consistent or inconsistent with the Discipline Matrix. But even if the punishment was inconsistent with the discipline matrix, the City presented evidence that the chief of police was authorized to impose discipline more stringent than that recommended in the discipline matrix. Perhaps more importantly, even if there were a policy violation, that does not raise an inference that the deviation was the result of religious discrimination.

It is also significant that the discipline was imposed by a new and different decision maker, Chief Batts. Plaintiff presented no evidence Batts perceived of Longmire as a Black Muslim, and no evidence whatsoever of religious intolerance on Batts's part. There was also no evidence of anti-Muslim bias on the part of Medeiros, who initiated the second IAD investigation; Juarez, who conducted the IAD investigation; or Breshears, the *Skelly* officer who recommended the eight-day suspension. Longmire's

37

"cat's paw" theory—that Jordan used others in the disciplinary process as "tool[s] for carrying out [Jordan's] discriminatory action"—also has no evidentiary support.[16]

Finally, Longmire argues he should have been given the opportunity to continue to work on his homicide cases after he transferred out of the homicide section because others were purportedly allowed to do so. Longmire stated in his declaration in opposition to the summary judgment motion that it was the practice for every homicide investigator during the past 20 years to complete work on open homicide cases after they transferred away. The judge ruled this statement inadmissible based on lack of personal knowledge. (Code Civ. Proc., § 437c, subd. (d); see also *Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 10–11.) Beyond that Longmire produced only anecdotal evidence from which a reasonable inference of discrimination could not be drawn.[17]

Because he relied on circumstantial evidence in opposition to summary judgment Longmire was required to produce "specific" and "substantial" evidence of pretext. (*Morgan*, *supra*, 88 Cal.App.4th at p. 69.) None of his evidence could lead a reasonable factfinder to conclude the discipline was more likely than not the result of religious bias. Summary judgment was properly granted in favor of the City.

---

[16] Longmire contends in his reply brief that Jordan used the others as a "cat's paw" to implement his supposed anti-Muslim bias based on his supposed erroneous perception that Longmire was a Black Muslim. (See generally, *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 113–116 & fn. 14.) This chain of reasoning amounts to pure conjecture. Aside from the lack of evidence that Jordan held anti-Muslim attitudes or perceived of Longmire as a Muslim, Longmire presented no admissible evidence that Jordan influenced the other decision makers in the Medeiros investigation and resulting discipline.

[17] Longmire identified Cruz as one other officer who was allowed to continue to work on cases after he retired from the homicide section. Joyner also filed a declaration saying that he and other officers were allowed to "finish up loose ends" on cases after they transferred out of homicide. Aside from the fact that Longmire's investigational deficiencies appear to have involved something more than tying up "loose ends," Longmire has not presented substantial evidence this was a regularly followed policy, and has not presented evidence such a policy had been applied to other officers who were subject to an internal affairs investigation at the time they transferred out of homicide.

## DISPOSITION

The judgment is affirmed.

_____
Becton, J.*

We concur:

_____
Margulies, Acting P.J.

_____
Banke, J.

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.